> **THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
www.flmb.uscourts.gov

### (Orlando Division)

In re:

| | |
|---|---|
| CONSOLIDATED LAND HOLDINGS, LLC, | Case No.  6:19-bk-04760 |
| | Chapter 11 |
| Debtors. | Jointly Administered[1] |

_____ /

**APPLICABLE DEBTORS:**

| | |
|---|---|
| 100 BERLIN LAND, LLC | Case No. 6:19-bk-4762 |
| | Chapter 11 |
| Debtor. | |

_____ /

| | |
|---|---|
| 200 STL LAND, LLC | Case No. 6:19-bk-4763 |
| | Chapter 11 |
| Debtor. | |

_____ /

| | |
|---|---|
| 204 FOX LAND, LLC, | Case No. 6:19-bk-04765 |
| | Chapter 11 |
| Debtor. | |

---

1   Jointly administered cases:  Consolidated Land Holdings, LLC, Case No. 6:19-bk-4760; Land Capital, LLC, Case No. 6:19-bk-4761; 100 Berlin Land, LLC, Case No. 6:19-bk-4762; 200 STL Land, LLC, Case No. 6:19-bk-4763; 204 Fox Land, LLC, Case No. 6:19-bk-04765; 205 Wolf Land, LLC, Case No. 6:19-bk-4766; 5500 Midland Land, LLC, Case No. 6:19-bk-4768; Appleton Land, LLC, Case No. 6:19-bk-4769; High Point Land, LLC, Case No. 6:19-bk-4770; JNHRSA, LLC, Case No. 6:19-bk-4771; JNHRSA 200 STL, LLC, Case No. 6:19-bk-4772; JNHRSA 205 Wolf, LLC, Case No. 6:19-bk-4773; JNHRSA Appleton, LLC, Case No. 6:19-bk-4774; JNHRSA Billings, LLC, Case No. 6:19-bk-4775; JNHRSA Cheyenne, LLC, Case No. 6:19-bk-4776; JNHRSA City Center, LLC, Case No. 6:19-bk-4777; JNHRSA Cromwell, LLC, Case No. 6:19-bk-4778; JNHRSA Hartford, Case No. 6:19-bk-4779; JNHRSA High Point, LLC, Case No. 6:19-bk-4780; JNHRSA St. Joe, LLC, Case No. 6:19-bk-4781; JNHRSA II, LLC, Case No. 6:19-bk-4782; and CC STL Holdings, LLC, Case No. 6:19-bk-4783.

_____/

205 WOLF LAND, LLC,                                    Case No. 6:19-bk-4766
                                                                    Chapter 11
      Debtor.

_____/

5500 MIDLAND LAND, LLC,                              Case No. 6:19-bk-4768
                                                                    Chapter 11
      Debtor.

_____/

APPLETON LAND, LLC,                                   Case No. 6:19-bk-4769
                                                                    Chapter 11
      Debtor.

_____/

HIGH POINT LAND, LLC,                                 Case No. 6:19-bk-4770
                                                                    Chapter 11
      Debtor.

_____/

## DISCLOSURE STATEMENT FOR LIQUIDATING PLAN OF REORGANIZATION OF WELLS FARGO BANK, N.A., AS TRUSTEE AS PROPONENT AND SECURED CREDITOR

GrayRobinson, P.A.
Roy S. Kobert, Esquire
Florida Bar No. 777153
301 E. Pine Street, Suite 1400
Orlando, FL 32801
(407) 843-8880 Telephone
(407) 244-5690 Facsimile
*Local Counsel for Lender*

- and -

Perkins Coie, LLP
Gary F. Eisenberg, Esquire

New York Bar No.: 2332823
1155 Avenue of the Americas
22nd Floor
New York, NY 10036-2711
(212) 262-2902 Telephone
(212) 977-1632 Facsimile
geisenberg@perkinscoie.com

148404005.6

## TABLE OF CONTENTS

I.      PURPOSES AND LIMITATIONS OF DISCLOSURE STATEMENT ........................... 1

    A.      Purpose of Disclosure Statement ........................................................................ 1

    B.      Definitions ............................................................................................................ 2

    C.      Enclosures ............................................................................................................ 2

    D.      Representations and Limitations ......................................................................... 2

    E.      Important Dates .................................................................................................... 3

    F.      Solicitation Procedures ....................................................................................... 4

    G.      Recommendation .................................................................................................. 4

    H.      Inquiries ............................................................................................................... 5

II.     BACKGROUND ............................................................................................................ 5

    A.      About the Land Debtors ....................................................................................... 5

    B.      Pre-Petition Rent Deficiencies ............................................................................ 6

    C.      Pre-Petition Debt Structure ................................................................................. 7

III.    SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE ................................... 7

    A.      First Day Motions and Orders ............................................................................. 7

    B.      Retention of Professionals ................................................................................... 8

    C.      Section 341 Meeting of Creditors ........................................................................ 8

    D.      Debtors' Plan Exclusivity .................................................................................... 9

IV.     SUMMARY OF THE PLAN ......................................................................................... 10

    A.      General Plan Objectives ...................................................................................... 10

    B.      Treatment of Unclassified Claims ....................................................................... 11

    C.      Classification and Treatment of Claims and Interests ......................................... 13

V.      MEANS OF IMPLEMENTING THE PLAN ................................................................. 20

    A.      Plan Funding ........................................................................................................ 20

i

# TABLE OF CONTENTS
(continued)

B.  Sale of Property ........................................................................................ 20

C.  Refinancing .............................................................................................. 22

D.  New Equity Issuance ................................................................................ 22

E.  Post-Effective Date .................................................................................. 23

F.  U.S. Trustee Fees and Post Confirmation Reports ................................. 23

G.  Filing of Documents ................................................................................ 23

H.  Execution of Documents .......................................................................... 23

VI.   RESOLUTION OF DISPUTED CLAIMS & RESERVES ................................ 24

VII.  PROVISIONS GOVERNING DISTRIBUTIONS ........................................... 24

VIII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......................... 28

A.  Rejection of Executory Contracts and Unexpired Leases ...................... 28

B.  Assumption and Assignments of Executory Contracts and Unexpired Leases .......................................................................................... 28

C.  Assumption Cure Payments ..................................................................... 28

D.  Rejection Claims ...................................................................................... 28

E.  Bar to Rejection Claims ........................................................................... 28

IX.   INJUNCTION AND EXCULPATION ............................................................... 29

A.  Binding Effect .......................................................................................... 29

B.  No Discharge. ........................................................................................... 29

C.  Injunction ................................................................................................. 29

D.  Exculpation .............................................................................................. 29

E.  All Distributions Received in Full and Final Satisfaction ..................... 30

X.    CONDITIONS PRECEDENT .............................................................................. 30

A.  Conditions Precedent to Confirmation of the Plan ................................. 30

B.  Conditions Precedent to the Plan Effective Date ................................... 31

ii

# TABLE OF CONTENTS
(continued)

| | | | |
|---|---|---|---|
| XI. | | RETENTION OF JURISDICTION | 31 |
| | A. | Retention of Jurisdiction | 31 |
| | B. | Post-Effective Date Jurisdiction | 33 |
| XII. | | CERTAIN TAX CONSEQUENCES OF THE PLAN | 33 |
| | A. | General | 33 |
| | B. | Tax Consequences of Payment of Allowed Claims Pursuant to Plan Generally | 34 |
| XIII. | | MISCELLANEOUS PLAN PROVISIONS | 35 |
| | A. | Orders in Aid of Consummation | 35 |
| | B. | Compliance with Tax Requirements | 35 |
| | C. | Due Authorization by Claim Holders | 35 |
| | D. | Amendments | 36 |
| | E. | Reservation of Rights | 36 |
| | F. | Revocation or Withdrawal of Plan | 36 |
| | G. | Request for Relief Under Section 1129(b) | 36 |
| | H. | Additional Documents | 36 |
| | I. | Section Headings | 37 |
| | J. | Computation of Time | 37 |
| | K. | Successors and Assigns | 37 |
| | L. | Notices | 37 |
| | M. | Governing Law | 38 |
| | N. | Severability | 38 |
| | O. | Business Day | 38 |
| XIV. | | CONFIRMATION OF PLAN – REQUIREMENTS | 38 |
| | A. | Absolute Priority Rule | 39 |

# TABLE OF CONTENTS

(continued)

B.     Feasibility..................................................................................................... 39

C.     Best Interest of Creditors Test; Liquidation Analysis........................................... 39

XV.    PLAN RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN.................................... 41

A.     Certain Bankruptcy-Related Considerations........................................................ 41

B.     Alternatives to the Plan and Consequences of Rejection...................................... 42

XVI.   PROCEDURES FOR VOTING ON PLAN ..................................................................... 43

XVII.  CONFIRMATION HEARING ......................................................................................... 44

XVIII. RECOMMENDATION .................................................................................................... 46

**PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY. THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN WHICH IS ENCLOSED WITH THIS DISCLOSURE STATEMENT. THE PROPONENT BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS CREDITORS AND PROVIDES FOR THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALLOWED CLAIMS AGAINST AND INTERESTS IN THE DEBTOR.**

Wells Fargo Bank, National Association, as trustee for the benefit of the holders of UBS Commercial Mortgage 2017-C3, UBS Commercial Mortgage 2017-C2 and Credit Suisse CASIL 2017-CX9 Mortgage Trust Commercial Mortgage Pass-Through Certificates ("Secured Creditor" or "Proponent" or "Wells Fargo"), secured creditor of the above captioned debtors and debtors in possession respectfully submits this Disclosure Statement (the "Disclosure Statement") pursuant to Section 1125 of title 11, United States Code, 11 U.S.C. §§ et seq. (the "Bankruptcy Code") and Rule 3017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to accompany its Plan of Reorganization dated August 27, 2020 (the "Plan") [Docket No. ___] for 100 Berlin Land, LLC, 200 STL Land, LLC, 204 Fox Land, LLC, 205 Wolf Land, LLC, 5500 Midland Land, LLC, Appleton Land, LLC, and High Point Land, LLC (collectively, the "Land Debtors" and together with their debtor-affiliates in the case of Consolidated Land Holdings, LLC, the "Debtors") which has been filed with the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court").

## I.     PURPOSES AND LIMITATIONS OF DISCLOSURE STATEMENT

### A.     Purpose of Disclosure Statement

The purpose of the Disclosure Statement is to set forth information that (i) summarizes the Plan and alternatives to the Plan, (ii) advises holders of Claims of their rights under the Plan, (iii) assists creditors entitled to vote in making informed decisions as to whether they should vote to accept or reject the Plan, and (iv) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

You are urged to read the Disclosure Statement in order to determine what rights you may have to vote on or object to the Plan and before making any decision on any such course of action. Particular attention should be directed to the provisions of the Plan affecting or impairing your rights as they existed before the institution of this chapter 11 case (the "Chapter 11 Case"). Please note, however, that this Disclosure Statement cannot tell you everything about your rights. For instance, this Disclosure Statement cannot and does not provide a complete description of the financial status of the Debtor, all of the applicable provisions of the Bankruptcy Code, or other matters that may be deemed significant by creditors and other parties in interest. You are also encouraged to consult with your lawyers and/or advisors as your review and consider the Disclosure Statement and the Plan to enable you to obtain more specific advice on how the Plan will affect you.

### B.    Definitions

Unless otherwise defined herein, capitalized terms used in this Disclosure Statement will have the meanings ascribed to such terms in the Plan.

### C.    Enclosures

The following materials are included with this Disclosure Statement:

1.    A copy of the Plan;

2.    A copy of an order conditionally approving the Disclosure Statement (the "Disclosure Statement Approval Order") which states: (a) the date by which objections to confirmation of the Plan must be served and filed, (b) the date by which all votes with respect to the Plan must be cast, (c) the date of the hearing in the Bankruptcy Court to consider confirmation of the Plan, and (d) other relevant information;

3.    Notice of Confirmation Hearing.  A copy of the notice of the deadline for submitting ballots to accept or reject the Plan and, among other things, the date, time and place of the Confirmation Hearing and the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"); and

4.    A ballot (and return envelope) for voting to accept or reject the Plan. There may be multiple plans filed, so the ballot may call for you to cast ballots as to the Plan and other plans proposed by other proponents.  Proponent recommends you vote to accept the Plan and reject any other plan from any other proponent.

### D.    Representations and Limitations

NO PERSON IS AUTHORIZED IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF VOTES THEREON TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION ON BEHALF OF THE SECURED CREDITOR OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE fS ANNEXED HERETO OR INCORPORATED HEREIN BY REFERENCE OR REFERRED TO HEREIN, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE SECURED CREDITOR.

NO REPRESENTATIONS FROM SECURED CREDITOR CONCERNING THE DEBTOR OR THE PLAN ARE AUTHORIZED OTHER THAN AS SET FORTH HEREIN. ANY REPRESENTATIONS OR INDUCEMENTS TO SECURE YOUR ACCEPTANCE OF THE PLAN OTHER THAN AS CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY YOU.

THE INFORMATION CONTAINED HEREIN HAS BEEN PREPARED BY THE SECURED CREDITOR IN GOOD FAITH, BASED UPON UNAUDITED INFORMATION IT UNDERSTANDS WAS AVAILABLE TO THE DEBTOR AS OF AUGUST 2020.  IT IS

POSSIBLE THAT THE DEBTOR HAS NOT PROVIDED TO THE SECURED CREDITOR MATERIAL INFORMATION FOR WHICH THE SECURED CREDITOR ACCEPTS NO RESPONSIBILITY FOR.  ALTHOUGH THE SECURED CREDITOR HAS USED BEST EFFORTS TO ENSURE THAT SUCH INFORMATION IS ACCURATE, THE INFORMATION CONTAINED HEREIN IS UNAUDITED AND IS PROVIDED PRIMARILY BY THE DEBTOR.  THE SECURED CREDITOR BELIEVES THAT THIS DISCLOSURE STATEMENT COMPLIES WITH THE REQUIREMENTS OF THE BANKRUPTCY CODE.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THIS DISCLOSURE STATEMENT AND/OR THE DATE THAT THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WERE COMPILED.   THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR, THE TRUSTEE, OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS AGAINST THE DEBTOR.

THE DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED AS A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN ITSELF.  EACH CREDITOR AND HOLDER OF AN INTEREST IS ENCOURAGED TO READ, CONSIDER AND CAREFULLY ANALYZE THE TERMS AND PROVISIONS OF THE PLAN.

E.     **Important Dates**

The Bankruptcy Court conditionally approved this Disclosure Statement by and through its Order Granting Motion To Terminate Exclusivity entered on July 28, 2020 (the "Conditional Disclosure Statement Approval Order") [Dkt. No. 557] after notice and hearing on the matters described in said order and in accordance with Section 1125 of the Bankruptcy Code.  The Bankruptcy Court has not made any specific finding that the information contained herein is of the kind, and is sufficiently detailed, to enable a hypothetical, reasonable investor typical of the class being solicited to make an informed judgment concerning the Plan, but Proponent believes that this Disclosure Statement does contain adequate information.  HOWEVER, THE BANKRUPTCY COURT HAS NOT CONFIRMED THE PLAN, NOR IS THIS DISCLOSURE STATEMENT OR THE CONDITIONAL DISCLOSURE STATEMENT APPROVAL ORDER TO BE CONSTRUED AS APPROVAL OR ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

148404005.6

As stated in the Conditional Disclosure Statement Approval Order, the Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan for October 14, 2020 at 1:00 a.m.  Holders of Claims and other parties in interest may attend this hearing. Objections to confirmation of the Plan must be filed on or before October 7, 2020 at 4:00 p.m. as set forth in the Conditional Disclosure Statement Approval Order.

All Ballots with respect to the Plan must be completed in full and signed to be counted in the tabulation of the votes and must be received by the Debtor no later than 4:00 p.m. on October 5, 2020.

Completed and signed Ballots should be returned by first class mail to the Court at the below address in the enclosed self-addressed return envelope:

United States Bankruptcy Court, Middle District of Florida

George C. Young United States Federal Building and Courthouse

400 West Washington Street

Suite 5100

Orlando, FL 32801

Or may be filed by eballot hyperlink:

https://pacer.flmb.uscourts.gov/cmecf/ballots/submission.asp

### F.    Solicitation Procedures

Creditors holding Claims that are impaired have the right to vote to accept or reject the Plan.  Generally speaking, a Claim is impaired if the Plan alters the legal, contractual, or equitable rights of the holder of the Claims.  A Class of creditors accepts the Plan when creditors holding two-thirds in amount of such class and more than one-half in number of the Claims in such class who actually cast their ballots vote to accept the Plan.

In this Chapter 11 Case, the Plan contains five (5) Classes of Claims or Interests.  The Plan provides that holders of Claims or Interests in the four classes are impaired in that the Plan alters the legal, contractual and equitable rights of the holders of such Claims or Interests.

### G.    Recommendation

In the opinion of the Secured Creditor, the treatment of creditors under the Plan contemplates a greater recovery than that which is likely to be achieved under any other alternative for the liquidation of the Debtors' assets under chapter 11 or chapter 7 of the Bankruptcy Code. Accordingly, the Secured Creditor believes that confirmation of the Plan is in the best interests of the Debtors' creditors and recommends that all holders of Claims entitled to vote on the Plan vote to accept the Plan.

148404005.6

### H.  Inquiries

If you have any questions about the packet of materials that you have received, please contact Gary F. Eisenberg, Esq. by email geisenberg@perkinscoie.com or by telephone at (212) 262-6902 during normal business hours.

## II.  BACKGROUND [2]

### A.  About the Land Debtors

Each of the Land Debtors' chapter 11 cases are being jointly administered in the chapter 11 case of *In re Consolidated Land Holdings, LLC*, Case No. 6:19-bk-04760.  However, the Land Debtors have not been substantively consolidated, nor has any party filed a motion for substantive consolidation of any of the Land Debtors.  In addition, the Plan ***does not*** propose substantive consolidation of any Land Debtors.

The Debtors are Delaware limited liability companies that are indirectly owned by the Gillespie Delware family trust.  Each Land Debtor's sole member is Consolidated Land Holdings, LLC ("CLH" or "Consolidated") (the lead debtor in these administratively but not substantively consolidated cases).  Each of the Land Debtors hold fee simple title to a different parcel of land and the hotels constructed thereon. The Land Debtors' properties are located in the following states:

| Debtor Entity | Location |
|---|---|
| 100 Berlin Land, LLC, Case No. 6:19-bk-4762 | Cromwell, Connecticut |
| 200 STL Land, LLC, Case No. 6:19-bk-4763 | St. Louis, Missouri |
| 204 Fox Land, LLC, Case No. 6:19-bk-04765 | Cheyenne, Wyoming |
| 205 Wolf Land, LLC, Case No. 6:19-bk-4766 | Albany, NY |
| 5500 Midland Land, LLC, Case No. 6:19-bk-4768 | Billings, Montana |
| Appleton Land, LLC, Case No. 6:19-bk-4769 | Appleton, Wisconsin |
| High Point Land, LLC, Case No. 6:19-bk-4770 | High Point, North Carolina |

Each of the Land Debtors' properties is subject to a mortgage or a deed in trust (collectively, the "Mortgages") in favor of the Secured Creditor to secure payment of a series of split promissory notes (collectively, the "Notes") all dated as of July 18, 2017 in the original principal amount of $62,465,000.00.  The Notes evidence a loan made by Secured Creditor's predecessor in interest Natixis Real Estate Capital LLC ("Original Lender") whose terms and conditions are further governed by that certain loan agreement (the "Loan Agreement") between

---

[2]  Much of this background information is taken from the Declaration of Deborah Bacon filed in *In re Consolidated Land Holdings, LLC*, Case No. 6:19-bk-04769 (KSJ), Docket No. 64-2 and exhibits thereto, dated August 16, 2019 and filed on the same date.

Original Lender and the Land Debtors.  Pursuant to the alonges to the Notes, the Trust is now the party entitled to enforce Original Lender's rights under the Loan Agreement.

Each of the Land Debtors has leased its respective hotel property pursuant to a 99-year ground lease (collectively, the "Ground Leases") to a corresponding non-debtor affiliate (other than Appleton Land, LLC, whose Tenant as hereinafter defined, Appleton Holdings, LLC, is a chapter 11 debtor before this Court, Case No. 6:19-bk-04883-KSJ) of that Land Debtor (each, a "Tenant") that manages and operates the hotel property.  Each Ground Lease provides for an annual base rent, payable in monthly installments, and an increase as of July 18 of each calendar year of three (3%) percent in such base rent.

In addition to Mortgages (each is recorded), each of the Land Debtors has executed and delivered in favor of the Secured Creditor an Assignment of Leases and Rents ("ALR"), each of which is recorded.  The ALR is a present assignment of all of the leases and rents of each of the Land Debtors and terminates only upon payment of the Notes in full.  The aggregate monthly rent under all of the Ground Leases is $409,140.33.  This amount exceeds the monthly debt service required under the Notes, which (prior to pre-petition acceleration) was approximately $270,022.31 per month.  Under the Loan Documents (as defined by the Loan Agreement), the Land Debtors are required to (a) direct their Tenants to pay rent to lockbox accounts with Wells Fargo[3] and (b) enforce each Ground Lease without any modification.

Upon information and belief, each Tenant granted a ground lease mortgage to third-party lender (each, a "Ground Lease Mortgage"). Prior to the Petition Date, each of the Tenants defaulted on their respective Ground Lease Mortgages.[4]  Four of the ground lease mortgage lenders have received assignments of the corresponding Ground Leases from the Tenants in lieu of foreclosure of the ground lease mortgages and therefore have become Tenants themselves.[5] It has been reported to Proponent that three of the hotels (on the properties leased by Land Debtors 100 Berlin Land, LLC, 200 STL Land, LLC and 5500 Midland Land) have ceased operations.

### B.    Pre-Petition Rent Deficiencies

Prior to the Petition Date, all of the Tenants failed to make their required rent payments to their Wells Fargo specified accounts.  Each Land Debtor was required to instruct each Tenant to remit all rent payments to an account with Wells Fargo in which Lender holds a perfected security interest, but the amount of rents delivered by each Tenant pre-petition is less than the amount of rent payable under the corresponding Ground Lease.  The aggregate rent deficiency is estimated by Lender to be not less than $2,269,147.65.  This contributed to the Land Debtors failing to fulfill their debt service obligations under the Loan Documents.  Based on Lender's review of the bank

---

[3]   Pre-petition, each such account was maintained at Wells Fargo; pursuant to this Court's orders, debtor-in-possession accounts are the required loci for Tenant payments under each Ground Lease and the Lender has a first priority lien on each DIP account's funds pursuant to the Agreed Cash Collateral Order as noted below.

[4]   Proponent knows this based on what is set forth in Section B below.

[5]   Pursuant to these assignments, DW Commercial Financing ("DW") became the Tenants of the Debtors 205 Wolf Land, LLC and 204 Fox Land, LLC.

statements for each of the Tenants, it appears that the Debtor Appleton Land, LLC has failed disclose rent paid in the amount of $652,031.65[6]

### C.    Pre-Petition Debt Structure

#### (i)    Wells Fargo – Secured Creditor

Under the Loan Agreement, each of the Land Debtors executed and delivered to Secured Creditor's predecessor in interest Notes in the original principal amount of $62,465,000.00. Including the Prepayment Premium, pursuant to the Agreed Cash Collateral Order, subject to a Land Debtor reservation of rights as to the Prepayment Premium, Secured Creditor holds an Allowed Secured Claim in the amount of $75,206,784.95, and the amount of the Allowed Secured Claim net of the Prepayment Premium is not less than $61,578,860.95.

## III.    SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

### A.    First Day Motions and Orders

On July 22, 2019, Consolidated Land Holdings, LLC and each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code and filed motions seeking authority to (1) pay prepetition employee wages (the "Wages Motion"), (2) use cash collateral ("Cash Collateral Motion"), and (3) maintain their prepetition bank accounts (the "Bank Account Motion"). After an emergency hearing on July 25, 2019, the Court entered order granting the relief requested in the Wages Motion and the Bank Account Motion. With respect to the Cash Collateral Motion, the Secured Creditor filed an *Emergency Motion to Compel (I) DW Entities to Tender Ground Lease Payments of Certain Debtors to Cash Collateral Account and (II) For Future Proposed Rent Payments to be Directed Into Cash Collateral Account of the Secured Creditor* [Docket No. 16]. Following an additional emergency hearing on July 30, 2019, Secured Lender and DW resolved the motion through an agreed order [Docket No. 49] and the Court entered an interim order permitting the use of cash collateral [Docket No. 107] (the "Interim Cash Collateral Order").

#### 1.    Stipulation Regarding the Debtors' Cash Collateral

During the Chapter 11 Cases, the Secured Creditor has protected its interests in the Land Debtors' estates by seeking to ensure that the Land Debtors directed post-petition rent payments to the DIP Accounts and that the Land Debtors took the necessary steps to require their Tenants to pay post-petition rent. In addition to the above described motion compelling the DW entities to pay rent, the Secured Creditor filed a motion seeking relief from the automatic stay and seeking certain conditions on use of the cash collateral [Docket No. 64]. Following court-ordered mediation, the Debtors and the Secured Creditor entered into a stipulation and proposed an agreed order resolving the Secured Lender's motion [Docket No. 264], which was approved by the Court

---

[6]    The rent deficiency of Debtor Appleton Land, LLC has, in part, been resolved by a *Stipulation Regarding Contested Matter Scheduled for Hearing on August 13, 2020* filed in the affiliate Appleton Land, LLC chapter 11 case pending before this Court.

on November 18, 2019 (the "Agreed Cash Collateral Order").[7]   Through the Agreed Cash Collateral Order, the Debtors and the Secured Creditor agreed, among other things, that:

- the Secured Creditor would have an allowed claim of $75,206,784.95 plus interest and other charges (subject to the Land Debtors' reservation of their right to contest liability for the yield maintenance premium (the "Prepayment Premium") under the Secured Creditor's Loan Documents);

- the Land Debtors would pay Ground Lease payments into debtor-in-possession bank accounts, and the Secured Creditor is deemed to have a perfected security interest and lien in such payment;

- the Debtors would pay the Secured Creditor Monthly Adequate Protection Payments (as defined by the Agreed Order and Stipulation); and

- the Debtors would consent to lifting the automatic stay to allow the Secured Lender to apply amount held in certain Lock Box accounts to pay prepetition debt service payments and prepetition tax advances.

### B.      Retention of Professionals

On September 27, 2019, the Bankruptcy Court initially entered an order granting the Debtors' application to employ Latham, Shuker, Eden & Beaudine, LLP as its general bankruptcy counsel [Docket No. 164], and later entered an order approving the appointment of Shuker & Dorris, P.A., as Debtors' counsel [Docket No. 174].

On September 27, 2019, the Bankruptcy Court entered an order granting the Debtors' application to employ Erin E. Wollet as Special Counsel [Docket No. 163].

### C.      Section 341 Meeting of Creditors

On September 27, 2019, Jill E. Kelso, of the Office of the United States Trustee, conducted the Section 341 meeting of creditors at its office located at the George C. Young Courthouse, 400 West Washington Street, Suite 1203B Orlando, Florida 32801.  Mr. Robert Schamber, Chief Operating Officer of Inner Circle Management, appeared and answered questions regarding the Debtors' financial affairs and its Schedules.

---

[7]    The full title of the Cash Collateral Order is "STIPULATION AND ORDER REGARDING WELLS FARGO BANK, N.A., AS TRUSTEE'S ("MOVANT") MOTION PURSUANT TO 11 U.S.C. §362(d)(1) AND 11 U.S.C. §363(e) (a) GRANTING RELIEF FROM THE AUTOMATIC STAY TO  PERMIT MOVANT TO APPLY CERTAIN CASH COLLATERAL IN PARTIAL SATISFACTION OF MOVANT'S SECURED CLAIM AND (b) TO CONDITION, DIRECT PAYMENT AND LIMIT USE OF REMAINING CASH COLLATERAL" and was filed with the Court under Notice of Filing (Docket No. 264), approved by the Court at a hearing on November 18, 2019 as noted on the Court's Pro Memo dated November 18, 2019 (Docket No. 268) subject to a 14-day objection period (and no objections were filed).

148404005.6

D.    <u>**Debtors' Plan Exclusivity**</u>

1.  **Agreed Exclusivity Extensions**

On December 4, 2019, the Court entered an order extending the Debtors' exclusive period in which to file a plan of reorganization to April 30, 2020 [Docket No. 285] (the "<u>First Exclusivity Extension</u>").  As the end of the First Exclusivity Extension approached, the Debtors sought an additional extension of the exclusive period to June 30, 2020 [Docket No. 377].  The Court entered an agreed order approving the extension, subject to the Debtors' compliance with certain conditions [Docket No. 395] (the "<u>Second Agreed Exclusivity Order</u>").  The Agreed Exclusivity Order imposed a number of obligations on the Land Debtors.  These included:

- Prompt filing of all outstanding monthly operating reports; *Agreed Exclusivity Order*, at ¶3

- Beginning April 2020 and each month thereafter for each hotel property, forwarding to the Lender of copies of monthly financial reports prepared by the underlying tenant, *id.* at ¶4.

- Immediate delivery of information regarding current occupancy levels at each hotel together with confirmation of which hotels have business interruption insurance, *ibid.*

- For each closed hotel, delivery of a property protection plan for its collateral, including but not limited to a budget and means for payment of the budgeted amounts which shall be updated monthly thereafter, ibid. (none has been delivered)

- Enforcement immediately of the requirement for payment of current real property taxes by the corresponding tenants, *id.* at ¶5 (while the Land Debtors have used cash collateral to pay real estate tax escrows, as required under the Cash Collateral Order, that only partially addresses the tax payment issue.  Each Tenant is required to pay its real estate taxes, and failure to do so results in diminution of the lease proceeds, adversely impacting Lender's collateral.  In addition, the tax escrows will not have been sufficient to permit payment of taxes current through the end of May, since the amount of tax escrows on hand is $134,228.31 less than the payments due through May 31, 2020.

- For the leases of the Cromwell, CT and High Point, NC properties, forthwith demand that the payments be cured, failure of which the Debtors shall move to terminate the leases, *id.* at ¶6

- No provision of any information on the status or physical condition of the hotel in Cromwell, CT.

The Debtors failed to comply with each of these conditions.  Accordingly, on May 27, 2020, the Secured Creditor filed its motion seeking to enforce the Second Agreed Exclusivity Order and to terminate the Debtors' exclusive period within which to file a plan of reorganization

pursuant to section 1121 of the Bankruptcy (the "Exclusivity Termination Motion") [Docket. No. 447]. On June 24, 2020, the Debtors filed the late Monthly Operating Reports for each the Debtors, but delayed delivery of other required reporting to the Lender.

### 2.  Debtors' First Plan of Reorganization and Disclosure Statement

Prior to the expiration of exclusivity, the Debtors filed a chapter 11 plan (the "Land Debtors' First Plan") [Docket No. 479] and accompanying disclosure statement (the "First Disclosure Statement") [Docket No. 480]. The Court entered the *Order Scheduling Trial and Preliminary Hearing by Video* [Docket No. 484], setting a trial hearing on July 27, 2020, for certain contested matters including the First Disclosure Statement and the Exclusivity Termination Motion. The Secured Creditor and the Debtors commenced discovery in anticipation of the trial.

### 3.  Termination of Exclusivity

Prior to the July 27 hearing, the Secured Creditor and the Debtors conferred and agreed to enter into the *Stipulation and Order Regarding Resolution of Contested Matters* [Docket No. 554]. The Court entered a hearing proceeding memo [Docket No. 559]. Key terms of stipulation provide for:

- the Debtors' withdrawal of the First Disclosure Statement;

- consent to entry of the Exclusivity Termination Motion; and

- conditional approval of a "Covered Disclosure Statement" and setting a hearing for confirmation on a "Covered Plan."

At the July 27 hearing the Court approved the key terms of the stipulation, with the condition that any proposed disclosure statement and plan of reorganization timely filed by August 28, 2020, would be conditionally approved and set for a confirmation hearing on October 14, 2020, at 1:00 p.m. ET. *See* Hearing Proceedings Memo [Docket No. 559]. The Court subsequently entered an *Order Granting the Motion to Terminate Exclusivity* [Docket No. 557], and the Debtors withdrew the First Disclosure Statement [Docket No. 555].

## IV.  SUMMARY OF THE PLAN

THE FOLLOWING IS A BRIEF SUMMARY OF THE PLAN. THE PLAN REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT AND CREDITORS ARE URGED TO CONSULT WITH THEIR COUNSEL IN ORDER TO FULLY UNDERSTAND THE PLAN AND TO MAKE AN INTELLIGENT JUDGMENT CONCERNING IT. THE PLAN GOVERNS OVER ANY DISCREPANCY IN THIS SUMMARY.

### A.  General Plan Objectives

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization. Asset sales, stock sales and other liquidation efforts, however, can also be conducted during a chapter 11 case or pursuant to a chapter 11 plan. Under chapter 11, a company endeavors to restructure its finances such that it maximizes recovery to its creditors.

148404005.6

Formulation of a chapter 11 plan is the primary purpose of a chapter 11 case. A chapter 11 plan sets forth and governs the treatment and rights to be afforded to creditors with respect to their claims against the debtor. According to Section 1125 of the Bankruptcy Code, acceptances of a chapter 11 plan may be solicited by the proponent of a plan only after a written disclosure statement has been provided to each creditor or shareholder who is entitled to vote on the plan.

The Plan is a plan of liquidation that the Proponent believes will ultimately maximize value for all its creditors. The Marketing Plan and Auction are expected to produce the sale of the Property to the qualified bidder who submits the highest and best bid at the Auction, the Proponent seeks authority under the Plan to move to close on that sale transaction and liquidate the Debtors' assets to provide for a recovery to the Debtors' creditors.

The Plan (i) divides claims into separate classes, by Land Debtor, (ii) specifies the property that each class is to receive under the Plan, and (iii) contains other provisions necessary to implement the Plan. Under the Bankruptcy Code, "claims" are classified rather than "creditors" because such entities may hold claims in more than one class.

Each Land Debtor is a separate entity. Each Land Debtor owns one asset and no Land Debtor owns any interest in any other Land Debtor asset. Each Land Debtor granted a separate mortgage on its real property in favor Lender, and under the Loan Agreement, each Land Debtor is required to be a Special Purpose Entity. As such, each Land Debtor is required to maintain its separate identity, separate assets, separate liabilities and arms'-length dealings with all Affiliates, including each other.

Each Land Debtor has a separate Tenant, with a separate Ground Lease providing a separate rent payment. Each Land Debtor has a separate and distinct body of creditors; indeed, counsel for the Land Debtors filed schedules and statements of financial affairs for each Land Debtor separately. Thus, each Land Debtor has a separate set of classes and only a creditor of or equity interest holder in a specific Land Debtor may vote and receive treatment under the Plan with respect to that Land Debtor.

## B.    Treatment of Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Fee Claims, and Priority Tax Claims are not classified but are treated in the manner set forth in Article II of the Plan and summarized below.

### 1.    *Administrative Claims*

Administrative Claims are not classified consistent with Section 1123(a)(1) of the Bankruptcy Code. Each holder of an Allowed Administrative Claim, other than holders of any Allowed Administrative Claim held by Wells Fargo or any Fee Claims or U.S. Trustee Fees, shall be paid by the Disbursing Agent, in full, in cash, in such amounts as may be Allowed by the Bankruptcy Court or as are incurred in the ordinary course of the liquidation of the Debtors, from the proceeds of the Sale, Refinancing or other transaction (as applicable) (a) on or as soon as reasonably practicable after the later of the Effective Date or the Closing Date, as applicable, and the date on which such Claim becomes an Allowed Administrative Claim, or on such other date and upon such other terms as may be agreed by the holder of such Allowed Administrative Claim

11

and the Disbursing Agent or ordered by the Bankruptcy Court.  In the event there exists any Disputed Administrative Claim on the Effective Date, the Debtors or the Disbursing Agent, as applicable, shall at all times hold and maintain Cash in an amount equal to that portion of a Disputed Claims Reserve attributable to all Disputed Administrative Claims.  Administrative Claims are not Impaired by the Plan.  Pursuant to Section 2.3 of the Plan, an Administrative Claim Bar Date is established as the first Business Day that is at least thirty (30) days after the earlier of the Closing Date or the Effective Date.

The foregoing treatment of Administrative Claims shall apply to each Debtor's chapter 11 case.

## 2.    *U.S. Trustee Fees*

The U.S. Trustee Fees are Unimpaired, but Wells Fargo reserves the right to challenge the amount and the basis for determination by the U.S. Trustee of any Claim for U.S. Trustee Fees. All U.S. Trustee Fees incurred by the U.S. Trustee prior to the Effective Date and not yet paid shall be paid by the Disbursing Agent on the Effective Date in accordance with the applicable schedule for payment of such fees including any interest thereon.  Until the Chapter 11 Case is closed by entry of a final decree of the Bankruptcy Court, the Debtors shall pay all additional U.S. Trustee Fees incurred in accordance with the applicable schedule for the payment of such fees including any interest thereon.  Commercially reasonable efforts shall be used to effectuate closing of this Case as soon as practicable after effectuation of the distributions provided hereunder.  The foregoing treatment of U.S. Trustee Fees shall apply to each Debtor's chapter 11 case.

## 3.    *Fee Claims*

Fee Claims are not classified consistent with Section 1123(a)(1) of the Bankruptcy Code. Each holder of an Allowed Fee Claim shall be paid in Cash in an amount equal to its Allowed Fee Claim on or as soon as reasonably practicable after the first Business Day following the date upon which such Claim becomes an Allowed Claim by Final Order of the Bankruptcy Court, unless such holder shall agree to a different treatment of such Claim.  In the event any Disputed Fee Claims exist on the Effective Date, the Secured Creditor or Disbursing Agent, as applicable, shall hold and maintain Cash in an amount equal to that portion of a Disputed Claims Reserve attributable to all Disputed Fee Claims until such dispute is resolved consensually or by order of the Bankruptcy Code.  Fee Claims are not Impaired by the Plan.

## 4.    *Priority Tax Claims*

Priority Tax Claims are not classified consistent with Section 1123(a)(1) of the Bankruptcy Code.  Except as may be otherwise mutually agreed in writing between the Debtors or Wells Fargo and any applicable Governmental Units, all Allowed Priority Tax Claims shall be paid by the Disbursing Agent (a) in the event of a sale, from the proceeds remaining in the Distribution Fund, if any, as soon as is reasonably practicable after the payment in full in Cash of all of the following: (i) Administrative Claims and (ii) Fee Claims.  Priority Tax Claims may be Impaired by the Plan subject to the amount of proceeds remaining in the Distribution Fund.

For the avoidance of doubt, the treatment of Priority Tax Claims that are secured by tax liens or warrants shall be treated consistent with section 1129(a)(9)(D) of the Bankruptcy Code.

12

### C.    Classification and Treatment of Claims and Interests

The Plan divides Claims against each Land Debtor into five (5) categories or "Classes" according to the underlying basis and subsequent treatment for each. Claims or Interests within the same Class are treated identically and each Class is treated differently. For all purposes under the Plan, each Class applies only to one specific Debtor.

The following classes of Claims are designated pursuant to and in accordance with section 1123(a)(1) of the Bankruptcy Code, which Classes shall be mutually exclusive:

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 100 Berlin Class 1 | Secured Claim of Wells Fargo | Impaired | Yes |
| 100 Berlin Class 2 | Secured Claim | Impaired | Yes |
| 100 Berlin Class 3 | General Unsecured Claims | Impaired | Yes |
| 100 Berlin Class 4 | Convenience Class | Impaired | Yes |
| 100 Berlin Class 5 | Interests | Impaired | Yes |

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 200 STL Class 1 | Secured Claim of Wells Fargo | Impaired | Yes |
| 200 STL Class 2 | Secured Claim | Impaired | Yes |
| 200 STL Class 3 | General Unsecured Claims | Impaired | Yes |
| 200 STL Class 4 | Convenience Class | Impaired | Yes |
| 200 STL Class 5 | Interests | Impaired | Yes |

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 204 Fox Class 1 | Secured Claim of Wells Fargo | Impaired | Yes |
| 204 Fox Class 2 | Secured Claim | Impaired | Yes |
| 204 Fox Class 3 | General Unsecured Claims | Impaired | Yes |
| 204 Fox Class 4 | Convenience Class | Impaired | Yes |
| 204 Fox Class 5 | Interests | Impaired | Yes |

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 205 Wolf Class 1 | Secured Claim of Wells Fargo | Impaired | Yes |
| 205 Wolf Class 2 | Secured Claim | Impaired | Yes |
| 205 Wolf Class 3 | General Unsecured Claims | Impaired | Yes |
| 205 Wolf Class 4 | Convenience Class | Impaired | Yes |
| 205 Wolf Class 5 | Interests | Impaired | Yes |

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 5500 Midland Class 1 | Secured Claim of Wells Fargo | Impaired | Yes |
| 5500 Midland Class 2 | Secured Claim | Impaired | Yes |
| 5500 Midland Class 3 | General Unsecured Claims | Impaired | Yes |

13

| | | | |
|---|---|---|---|
| 5500 Midland Class 4 | Convenience Class | Impaired | Yes |
| 5500 Midland Class 5 | Interests | Impaired | Yes |

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| Appleton Class 1 | Secured Claim of Wells Fargo | Impaired | Yes |
| Appleton Class 2 | Secured Claim | Impaired | Yes |
| Appleton Class 3 | General Unsecured Claims | Impaired | Yes |
| Appleton Class 4 | Convenience Class | Impaired | Yes |
| Appleton Class 5 | Interests | Impaired | Yes |

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| High Point Class 1 | Secured Claim of Wells Fargo | Impaired | Yes |
| High Point Class 2 | Secured Claim | Impaired | Yes |
| High Point Class 3 | General Unsecured Claims | Impaired | Yes |
| High Point Class 4 | Convenience Class | Impaired | Yes |
| High Point Class 5 | Interests | Impaired | Yes |

1.    *Classes 1 – Wells Fargo*

    (a)    *Classification*:  For each Debtor, Class 1 consists of Secured Claims consisting of the Allowed Secured Claim of Proponent.  There is a 100 Berlin Class 1, 200 STL Class 1, 204 Fox Class 1, 205 Wolf Class 1, 5500 Midland Class 1, Appleton Class 1 and a High Point Class 1.

    (b)    *Treatment*:  The Allowed Secured Claim of Proponent shall be treated in each Debtor's case as follows.  All of the Assets, including without limitation all of the Estate's: (i) Property, (ii) personal property used at, upon or in connection with the operation of the Property (the "Personalty") and (iii) other intangible assets of the Debtors, including without limitation all Leases where any Debtor is a landlord (including the Ground Leases) (excluding (a) cash transferred pursuant to a Cash Transfer as defined below and (b) Avoidance Actions) as shall be designated by Proponent (the "Remaining Assets") shall be transferred (the "Property Transfer") through the occurrence of a public auction sale or otherwise pursuant to the Sale described below to be conducted on the terms and conditions contained herein. Each Holder of an Allowed Class 1 Claim is Impaired and is entitled to vote to accept or reject the Plan. The Property Transfer may be in parcels or *en masse* as determined by Proponent with input from the Marketing Agent.

    *Marketing and Sale.*

The Marketing Agent shall be responsible for designing and implementing the Marketing Plan, whereby the Marketing Agent will advertise and conduct one or more prompt, efficient, and orderly sales (each, a "Sale") of the Properties Proponent's Allowed Claims shall be paid from the Proceeds of any sale conducted under the Marketing Plan.

*Auction Sale.*

If the Marketing Agent is unable to procure one or more buyers offering an aggregate price for the Properties (or any of them) sufficient to generate net Proceeds equal to or greater than Proponent's Allowed Claims (remaining owing after payment of the proceeds of sales of any Properties to Proponent), any Properties that have not been sold under the Marketing Plan (or sold prior to the Marketing Plan) will be transferred through an auction sale (the "Auction Sale") to a buyer (the "Purchaser") who will be identified through the process described in this section. Proponent shall provide at least 21 days' notice of the date on which the Auction Sale will take place (the "Auction Date") to the Holders of Allowed Claims, and will publish notice in such publications as Proponent elects, if any. At Proponent's election, the Sale will be either in parcels, *en masse* or in a combination of in parcels and *en masse* so as to attempt to yield the maximum Proceeds. If the Properties are sold in parcels, the Proceeds of each Sale shall be distributed to each respective Debtor's creditors and other parties in interest as provided in this Article III for each separate Debtor. If the Properties are sold *en masse,* the net Proceeds of Sale will be allocated to each Debtor's Estate, either based on the allocation of the Sale Price to a specific Property as provided by the Purchaser unless manifestly unreasonable to the Proponent in its sole discretion or in proportion to the non-Event of Default release prices as set forth in the Loan Agreement, to be distributed to each respective Debtor's creditors and other parties in interest as provided in this Article III for each separate Debtor.

*Vesting of Assets*

Except as otherwise provided in the Plan, on the Closing Date, to the fullest extent provided by the Bankruptcy Code or other applicable law, the Property shall vest in the successful purchaser free and clear of all Liens, Claims and encumbrances (other than Assumed Contracts and the Ground Leases) and any other Liens, Claims and encumbrances that have not been expressly preserved under the Plan shall attach to the Sale Proceeds as of such date, to be distributed as provided in the Plan.

*Credit Bid and Sale Proceeds*

The Sale Proceeds shall be used solely to fund the Distribution Fund and utilized to satisfy payments consistent with the terms of the Plan. Proponent is entitled to credit bid at such Sale pursuant to 11 U.S.C. §363(k) up to the

Allowed Amount of Proponent's Claim (including all sums awarded pursuant to the Agreed Cash Collateral Order and including the Prepayment Premium referenced in the Agreed Cash Collateral Order (the "*Total Bid*"). The Total Bid shall be reduced by an amount equal to the amount of any actual cash transferred to Proponent between the Petition Date and the Sale Date by the Debtors or otherwise in partial payment of the Obligations (the "*Cash Credit*"), but in each case subject to the accrual of interest at the Default Rate that has continued since the Petition Date. Proponent shall have no obligation to bid and/or become the successful bidder at the Sale. Proponent may bid in excess of the sum of the Total Bid, to the extent that Proponent or the Designee agrees at the Sale to pay in immediately available funds any amounts above the Total Bid in increments to be coordinated with Proponent at the sale. If Proponent is the successful bidder at the Sale, or if otherwise a Property Transfer to Proponent or the Designee occurs, upon the closing of the Property Transfer, all of the Assets will be transferred to Proponent or the Designee Free and Clear in partial satisfaction of Proponent's Allowed Secured Claim, and the Cash Transfer will occur on the Effective Date. If Proponent is the successful bidder at the Sale, Proponent may postpone the vesting of title to the Assets in Proponent, Designee or a Third Party Purchaser until execution, delivery and closing of a Third Party Contract, in which case the proceeds of such Third Party Contract shall be payable to Proponent (so long as all other Plan Obligations and payments to holders of Allowed Class 4 Claims shall have been paid not later than simultaneously with the closing of such Third Party Contract) and the vesting of the title shall be entitled to the benefits of Section 1146(a) as set forth in the section below entitled "Transfer Taxes."

If Proponent is not the successful bidder at the Sale, Proponent shall be paid (after payment of all regular closing costs and adjustments, Allowed Administrative Claims and Allowed Priority Claims) (x) the proceeds of the Sale up to the Allowed Amount of its Claim (less credit for all cash and money equivalents transferred to Proponent pursuant to a Cash Credit) Free and Clear with Proponent having an Allowed Class 3 Claim for any amounts remaining unpaid after the sale plus (y) all cash or other money alternatives held by the Debtors or held in any account where Proponent holds a Lien on such cash or money equivalents or the account or its contents, which shall be transferred to Proponent Free and Clear (the "*Cash Transfer*"). In addition, the Cash Transfer will be made to Proponent whether or not Proponent is the Purchaser. The Debtors will advise Proponent of the estimated amount of the Cash Transfer not less than seven (7) days prior to the Auction Date so that Proponent can formulate any credit bid it intends to make taking into consideration the estimated Cash Transfer.

Any Property Transfer shall vest Proponent, the Designee or the Purchaser (as applicable) with good and marketable title to the Assets Free and Clear other than as provided above. The Property Transfer will be "AS IS, WHERE IS", with no warranties express or implied. The transferee of any

Property Transfer shall be found and determined to be a good faith purchaser, as defined in 11 U.S.C. §363(m).

Proponent or the Designee shall, at its option, have the right to retain the Debtors' existing management company or any other appropriate entity as manager or operator of any Property, on terms and conditions mutually agreeable to Proponent or the Designee on the one hand and management company on the other hand. After payment of ordinary operating expenses, and without derogating from the Cash Transfer set forth above, Proponent or the Designee shall be entitled to receive distribution of all net income from the Properties post-Effective Date.

*Transfer Taxes*

Pursuant to Section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan and the making or delivery of an instrument of transfer of property or otherwise, pursuant to or in connection with the Plan or the Sale shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax or governmental assessment in the United States or by any other governmental unit, and the Confirmation Order shall direct and be deemed to direct the appropriate federal, state or local (domestic or foreign) governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to or in connection with such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to the sale of the Property to the Successful Purchaser and, if Secured Creditor is the Successful Purchaser, to any designee of its right to receive execution and delivery of a Deed or otherwise to any Third Party Purchaser pursuant to a Third Party Contract.

*Document Execution and Delivery*

Proponent shall be authorized to sign in the name of the Debtors (with a limited power of attorney) all documents that Proponent determines in its sole discretion will further the Property Transfer (including such documents in aid of issuing, preserving or transferring any license to operate the Property and including pursuant to any Third Party Contract) or are otherwise reasonably necessary or useful for the carrying out of the transactions contemplated under this Plan.

(c)    *Voting*:  Each Class 1 is Impaired under the Plan.  Holders of the Wells Fargo Secured Claim against each Debtor are entitled to vote to accept or reject the Plan as to that Debtor only.

2.    *Class 2 – Other Secured Claims*

(a)   *Classification*:   For each Debtor, Class 2 consists of Secured Claims consisting of Allowed Claims secured by a Lien on any Property with priority inferior to that of the Proponent.  There is a separate 100 Berlin Class 2, 200 STL Class 2, 204 Fox Class 2, 205 Wolf Class 2, 5500 Midland Class 2, Appleton Class 2 and High Point Class 2.

(b)   *Treatment*:  The Allowed Secured Claim of any holder of a Class 2 Claim as against any Debtor shall be paid from the remaining proceeds of the Distribution Fund corresponding to that Debtor (less $28,000.00 in the aggregate from the overall Distribution Fund, to be made available for distribution to holders of Class 3 and Class 4 Allowed Claims of the seven Land Debtors in the aggregate (the "Distribution Fund Carve-Out"), if any, promptly after the payment in full in Cash of all of the following: (a) Administrative Claims, (b) Fee Claims, and (c) the Class 1 Claim, provided, however, that if the Sale Proceeds are less than the amounts required to satisfy (a), (b) and (c) in the aggregate, the balance of such Class 2 Claim which remains unpaid (after utilization of the Distribution Fund subject to the carve-out above) shall be treated as a Class 3 General Unsecured Claim.  Class 2 is Impaired, and each holder of an Allowed Class 2 Claim is entitled to vote to vote to accept or reject the Plan.

(c)   *Voting*:  Each Debtor Class 2 is Impaired under the Plan.  Holders of the Class 2 Claims against a specific Debtor are entitled to vote to accept or reject the Plan as to that Debtor only.

3.   *Class 3 – Allowed General Unsecured Claims*

(a)   *Classification*:  For each Debtor, Class 3 consists of General Unsecured Claims against that Debtor alone.  There is a separate 100 Berlin Class 3, 200 STL Class 3, 204 Fox Class 3, 205 Wolf Class 3, 5500 Midland Class 3, Appleton Class 3 and High Point Class 3.

(b)   *Treatment*:  Holders of Allowed General Unsecured Claims against any Class 3 Debtor shall receive the greater of the following:  (a) one or more distributions on a Pro Rata basis, up to one hundred percent (100%) of such Allowed General Unsecured Claim, in full and final satisfaction of such Allowed General Unsecured Claim, from the remaining proceeds of the corresponding Debtor's Distribution Fund, if any, promptly after the payment in full in Cash of all of the following against that Debtor: (i) Administrative Claims, (ii) Fee Claims, (iii) the Class 1 Claim of that Debtor, (iv) the Class 2 Claims, and (v) Priority Tax Claims, with no post-Petition Date interest thereon, or (b) Cash equal to its Pro Rata share of $4,000.00 (to be funded from the Distribution Fund Carve-Out), based on a ratio of the amount of such Allowed Claim to all Allowed Class 3 Claims of that corresponding Debtor.  Each Class 3 is Impaired, and holders of a Class 3 Claim against any Debtor are entitled to vote to accept or reject the Plan for that Debtor.  Each holder of an Allowed Class 3 Claim may in the

alternative elect to be treated as a Class 4 Claim for that Debtor and received the treatment as provided in paragraph 3.4 below. In such instance, such holder's ballot shall be considered a ballot cast in Class 4. The ballot election may be submitted as a conditional one so that, depending on the outcome of the Sale, each such Holder of an Allowed Claim in any Debtor Class 3 receives the greater of (i) the distribution obtaining under that Debtor's Class 3 if Sale proceeds are sufficient without any contribution from Proponent to produce a greater distribution than would be realized by such Holder receiving Class 4 treatment for that Debtor and (ii) the treatment for such Holder receiving Class 4 treatment for that Debtor, in the event Sale proceeds are insufficient to produce the result set forth in subsection (i) above. Any Class 3 Claim for any Debtor making such conditional election will have its ballot counted in the Class yielding the greater distribution.

(c)     *Voting:* Each Debtor Class 3 is Impaired under the Plan. Holders of the Class 3 Claims against a specific Debtor are entitled to vote to accept or reject the Plan as to that Debtor only.

4.     *Class 4 – Allowed Convenience Class Claims*

(a)     *Classification*: For each Debtor, Class 4 consists of Allowed Claims of those Creditors holding Unsecured Claims against that Debtor (including Deficiency Claims) that elect treatment under this Class 4. There is a separate 100 Berlin Class 4, 200 STL Class 4, 204 Fox Class 4, 205 Wolf Class 4, 5500 Midland Class 4, Appleton Class 4 and High Point Class 4.

(b)     *Treatment*: Each Holder of an Allowed Claim in any Debtor Class 4 who shall accept the Plan shall receive Cash equal to the lesser of $2,000.00 or the amount of its Allowed Claim without interest, whichever is smaller.

(c)     *Voting:* Each Debtor Class 4 is Impaired under the Plan. Holders of the Class 4 Claims against a specific Debtor are entitled to vote to accept or reject the Plan as to that Debtor only.

5.     *Class 5 – Interests*

(a)     *Classification*: For each Debtor, Class 5 consists of the Allowed Interests. There is a separate 100 Berlin Class 5, 200 STL Class 5, 204 Fox Class 5, 205 Wolf Class 5, 5500 Midland Class 5, Appleton Class 5 and High Point Class 5.

(b)     *Treatment*: Each Holder of an Interest in any of the Debtors shall, in the event of a Sale, receive a Pro Rata portion of the remaining proceeds of the Distribution Fund allocable to that Debtor, if any, after the payment of all classified and unclassified Allowed Claims. In addition, the interests in each Debtor shall be cancelled and each Debtor shall be deemed dissolved as of the Effective Date.

(c)     *Voting*: Each Debtor Class 5 is Impaired under the Plan.  Each Debtor Class 5 is Impaired, and each holder of an Allowed Class 5 Interest against any Debtor is entitled to vote to vote to accept or reject the Plan for that Debtor.

6.     *No Cross-Voting*.  Only a Holder of an Allowed Class 1, 2, 3 or 4 Claim or Class 5 Interest as to a particular Debtor may vote to accept or reject the Plan as to that Debtor. A Holder of an Allowed Class 1, 2, 3 or 4 Claim or Class 5 Interest as to one Debtor but not another Debtor may vote to accept or reject the Plan as to the Debtor against whom the Holder holds the Claim or in whom the Holder holds the Interest, but may not vote to accept or reject the Plan as to any Debtor against whom the Holder does not hold a Claim or Interest.

## V.     <u>MEANS OF IMPLEMENTING THE PLAN</u>

### A.     <u>Plan Funding</u>

As a condition to effectiveness of the Plan, there must occur the following: (x) closure on the Sale of the Property and (y) payment of a sum equal to the amount of Allowed Administrative Claims, Allowed Priority Claims and Allowed Convenience Class Claims.  The Sale of the Property, and execution and delivery of a deed for the Property to an assignee of Secured Creditor's winning bid, if any, each is intended to be exempt from otherwise applicable transfer taxes in accordance with Section 1146(a) of the Bankruptcy Code.  The Plan shall be funded with (a) Cash on hand remaining after the Cash Transfer (but Proponent may elect to allow the Debtors to retain an amount of Cash otherwise to be transferred pursuant to the Cash Transfer to be included in the Distribution Fund) and (b) the net proceeds of (i) a Sale of the Property pursuant to the Bid Procedures and (ii) a cash contribution from the Secured Creditor (which Secured Creditor shall have no obligation to make other than in amount sufficient (if the sum of (a) and (b)(i) above yields insufficient proceeds to pay the amounts required to be paid under this Plan) to pay the difference between (q) the sum of (i) Allowed Administrative Claims, Allowed Priority Claims and Allowed Convenience Class Claims and (ii) distributions required to be paid to Holders of Allowed Claims under Class 4 and (r) sum of (a) and (b)(i) above), or any combination of the foregoing.

### B.     <u>Sale of Property</u>

1.     *The Sale Process*

Through the assistance of the Marketing Agent, there shall be conducted  a Sale process in accordance with such procedures as Proponent shall, in its sole and absolute discretion, determine are reasonably likely to facilitate a Sale to yield the maximum net Proceeds, pursuant to Bankruptcy Code Section 1123(a)(5), free and clear of any and all Liens, Claims, and encumbrances (except for Assumed Contracts) to the fullest extent provided by the Bankruptcy Code or other applicable law.

2.     *Bid Procedures*

(i)     The Auction.  If the Sale Process does not yield sales of the Property generating sufficient Proceeds to satisfy Proponent's Allowed Claim in full, Proponent shall, with the Marketing Agent's assistance, conduct an Auction

of the Property, 21 days after the entry of the Confirmation Order, through a virtual platform with a link to be filed in a notice with the Court. That Auction shall constitute a component of the Sale process described in this Plan.

(ii)     The Credit Bid.  Proponent shall be entitled to submit a Credit Bid as provided in Section 3.1 above.

(iii)    Qualified Bidder.  Proponent is a Qualified Bidder at the Auction.

(iv)    Disputes.  Any disputes arising from the Auction, or regarding any of the Bid Procedures, shall be submitted to the Bankruptcy Court.  In the interest of judicial economy, any dispute shall first be raised by the parties to the dispute contacting Chambers by phone.

   3.     *Vesting of Assets*

Except as otherwise provided in the Plan, on the Closing Date, to the fullest extent provided by the Bankruptcy Code or other applicable law, the Property shall vest in the successful purchaser Free and Clear and any other Liens, Claims and encumbrances that have not been expressly preserved under the Plan shall attach to the Sale Proceeds as of such date.

   4.     *Sale Proceeds*

The Sale Proceeds shall be used solely to fund the Distribution Fund and utilized to satisfy payments consistent with the terms of the Plan.

   5.     *Transfer Taxes.*

Pursuant to Section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan and the making or delivery of an instrument of transfer of property or otherwise, pursuant to or in connection with the Plan or the Sale shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax or governmental assessment in the United States or by any other governmental unit, and the Confirmation Order shall direct and be deemed to direct the appropriate federal, state or local (domestic or foreign) governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to or in connection with such transfers of property without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to the sale of the Property to the Successful Purchaser and, if Secured Creditor is the Successful Purchaser, to any designee of its right to receive execution and delivery of a Deed.  In connection with this, if the Secured Creditor is the Successful Purchaser, it shall have the right to forbear from receiving and recording a Deed to the Property while it attempts to re-market the Property for sale to a third party, upon which a Deed to such third party directly from the Debtors may be executed, delivered and recorded without being  subject to any stamp, real estate transfer, mortgage recording, or other similar tax or governmental assessment in the United States or by any other governmental unit.

C.    **Refinancing**

Notwithstanding any of the foregoing, the Debtors shall have the absolute right prior to the conduct of the Auction to (i) satisfy the Allowed Class 1 Claim and/or any Allowed Class 2 Claim through a refinancing, capital raise or any other means available, at any time up to the Closing of a Sale, and (ii) engage a broker (at the Debtors' own expense) to assist in such efforts. The time period for the Debtors to identify any such transactions shall be through the date for the Auction. If such transaction occurs, the Secured Creditor retains the right to withdraw the Plan. Secured Creditor shall withdraw the Plan. The Secured Creditor considers such an outcome to be unlikely.

D.    **New Equity Issuance**

On the Effective Date, at the option of Proponent, (a) all or such portion as Proponent or the Designee shall elect of the Equity Interests in each Reorganized Debtor shall be transferred to Proponent or the Designee, and the entity documents and other governing documents for each Reorganized Debtor shall be modified as Proponent or the Designee, consistent with the Plan, shall elect (including without limitation changing the Debtor's entity form to that of a different entity, for example, changing a partnership to a limited liability company; any of such, an "Entity Form Change") (the occurrence of the transactions set forth in this subparagraph shall be referred to as the "New Equity Issuance"), or (b) all of the Equity Interests of each Debtor shall be deemed canceled, annulled, extinguished, and surrendered without any further action by any party and shall no longer be of any force and effect. If any Debtor is a partnership or limited liability company, the New Equity Issuance shall constitute the substitution of such entities as Proponent or the Designee shall elect (the "Substituted Equity Holders") as partners or members, as the case may be, in each Debtor in place of the then-current partners or members in such Debtor. Such substitution may be accompanied by a simultaneous or subsequent Entity Form Change, with the Substituted Equity Holders' status in the Reorganized Debtor changing to that appropriate for the form of entity resulting from the Entity Form Change. If a New Equity Issuance occurs, at the option of Proponent, a Property Transfer may still occur but need not occur. In addition, if the New Equity Issuance occurs, then except as otherwise expressly provided in the Plan, upon occurrence of a New Equity Issuance, title to all assets of each corresponding Reorganized Debtor under the Plan shall continue to vest in the corresponding Reorganized Debtor, Free and Clear, including from all liens, encumbrances, charges claims, interests of creditors and equity security holders arising on or before the Effective Date (other than as provided in the Class 1 Creditor Documents), and the Reorganized Debtor may operate its business, from and after the Effective Date, free from any restrictions imposed by the Bankruptcy Code or by prior Orders of this Court. In addition, if the New Equity Issuance occurs, all liens of any kind against any property of the estate of the Reorganized Debtor shall be discharged, extinguished, removed, expunged, or otherwise disallowed as against all property of the Estate of the Reorganized Debtor, other than liens in favor of Proponent which Proponent or the Designee, as the case may be, may elect to have continued, pursuant to the Loan Documents, as may be amended with the consent of Proponent. No New Equity Issuance shall derogate from the treatment to be provided to each Debtor's Holders of Allowed Class 3 Claims, Class 4 Claims and Class 5 Interests. Provision for the Proponent to have the option to do the New Equity Issuance does not derogate from the lack of substantive consolidation of any of the Debtors under the Plan or the ban on cross-voting as set forth in Article IV, Section 6 above.

### E.  Post-Effective Date

1.  *Sale.*

In the event of a sale, the Debtors shall continue to exist after the Effective Date for the purposes of allowing the making of Distributions to holders of Allowed Claims and Interests under the Plan, and to take any other steps in furtherance thereof or, if applicable, as may be reasonably necessary or appropriate to wind-down its affairs and its Estate, including filing and prosecuting objections to Claims, if any, and if necessary.  The principal purpose of the Debtors shall be to (i) implement the Plan, (ii) if necessary, liquidate, collect and maximize the Cash value of the any remaining assets of the Estate, and (iii) make Distributions on account of Allowed Claims in accordance with the terms of the Plan.  However, nothing in this paragraph shall diminish the powers granted to the Disbursing Agent or Proponent pursuant to Section 6.15 of this Plan.

2.  *Refinancing.*

In the event of a Refinancing approved by the Bankruptcy Court through an order which has become final and non-appealable, the Proponent may withdraw this Plan, in which case (i) the Debtors shall continue to exist, (ii) all of the Debtors' assets, including the Property, will vest in the Debtors, (iii) the Owner shall retain his Interest in the Debtors, and (iv) the Property will be managed by the Debtors.

### F.  U.S. Trustee Fees and Post Confirmation Reports

The Debtors shall be responsible for filing post-confirmation reports with the Bankruptcy Court and the Disbursing Agent shall effectuate payment of all quarterly fees required under 28 U.S.C. § 1930 and applicable interest under 31 U.S.C. Section 3717, on behalf of the Debtors, who shall remain responsible therefore, until the earlier of (a) conversion or dismissal of the Chapter 11 Case or (b) entry of a final decree closing the Chapter 11 Case.

### G.  Filing of Documents

Pursuant to Sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, each and every federal, state and local governmental agency or department, shall be directed to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transactions contemplated by the Plan, and any and all notices of satisfaction, release or discharge or assignment of any Lien, Claim or encumbrance not expressly preserved by the Plan.

### H.  Execution of Documents

Without derogating from any authority granted to Proponent or the Purchaser, Proponent is authorized to execute and deliver (in the Debtors' name) all documents to which the Estate shall be a party pursuant to this Plan.  Without detracting from this Plan and in particular Section 3.1, the Court may appoint an agent to execute and deliver on behalf of any party any document that is an exhibit to the Plan with full force and effect as if such party had executed and delivered such document, in the event such party does not execute and deliver such exhibit after request by either the Disbursing Agent or Proponent.

23

## VI.  RESOLUTION OF DISPUTED CLAIMS & RESERVES

1.  *Objections*

The Proponent alone may file an objection to the allowance of a Claim or Interest with the Bankruptcy Court, in writing, no later than the time provided under Section 6.4 of this Plan.

2.  *Amendment of Claims*

A Claim may not be amended after the Effective Date unless agreed upon in writing by the Proponent and the holder of such Claim, and, in the case of an Allowed Class 1 Claim or Allowed Class 2 Claim, Proponent and the Holder of such Allowed Class 2 Claim, respectively, and as approved by the Bankruptcy Court or as otherwise permitted by the Bankruptcy Code and Bankruptcy Rules.

3.  *Reserve for Disputed Claims*

Notwithstanding anything contained in this Plan to the contrary, the Disbursing Agent shall reserve, on account of each holder of a Disputed Claim, in Cash, the amount that would otherwise be distributable to such holder were such Disputed Claim an Allowed Claim on the date of Distribution.  The Cash so reserved for the holder of such Disputed Claim shall be distributed only after such Disputed Claim becomes a subsequently Allowed Claim.  The holder of a subsequently Allowed Claim shall not be entitled to any additional interest on the Allowed Claim, regardless of when Distribution thereon is made to or received by such holder.

## VII.  PROVISIONS GOVERNING DISTRIBUTIONS

1.  *Disbursing Agent*

The Proponent or such agent as the Proponent may retain pursuant to an order of the Court on appropriate notice to interested parties shall act as Disbursing Agent for the purpose of making all distributions provided for under the Plan.  The Disbursing Agent shall be entitled to be paid compensation at its regular hourly rate from proceeds to be distributed pursuant to this Plan, subject to approval by the Bankruptcy Court.  The Bankruptcy Court shall retain jurisdiction to approve such fees.  The Disbursing Agent shall be authorized to hold in escrow the sum of $10,000 pending approval of the Disbursing Agent fees, which fees shall be an Allowed Administrative expense. The Disbursing Agent shall distribute all Cash or other property to be distributed under the Plan. Pending the final distribution of all sums distributable under the terms of the Plan, the Disbursing Agent shall have full authority to sign checks on any bank account of the Debtors to the extent necessary to make any payment or distribution contemplated by the Plan.

2.  *Timing of Distributions Under the Plan*

Subject to Sections 6.6 and 6.8 of the Plan, any payments, Distributions or other performance to be made pursuant to the Plan on account of any Disputed Claim shall be deemed to be timely made if made as provided for under this Plan on the later of the Closing Date or the Effective Date, on or within five days following the later of (i) the expiration of any applicable

148404005.6

objection deadline with respect to such Disputed Claim or (ii) such other times as may otherwise be provided in the Plan.

### 3.   *Method of Payment*

Unless otherwise expressly agreed, in writing, all Cash payments to be made pursuant to the Plan shall be made by check drawn on a domestic bank, or wire transfer, if requested.

### 4.   *Claims Objection Deadline.*

Subject to further extension by the Proponent, objections to the allowance of any Claim may be filed only by the Proponent and in any event no later than the later of (i) thirty (30) days after the Effective Date or (ii) thirty (30) days after the date proof of such Claim or Interest or a request for payment of such Claim is filed.

### 5.   *Prosecution of Objections*

After the Confirmation Date, only the Proponent shall have authority to file, settle, compromise, withdraw or litigate to judgment objections to Disputed Claims.  The Proponent may comprise any objections to Disputed Claims without further order of the Court.

### 6.   *No Distribution Pending Allowance*

Notwithstanding any other provision of the Plan, no payment or distribution of any kind shall be made with respect to any portion of a Claim that is a Disputed Claim unless and until all objections to such Claim are resolved by Final Order.  For the avoidance of doubt, any portion of a Claim that is an Allowed Claim shall be timely paid pursuant to the provisions of the Plan. Notwithstanding any other provision of paragraph 6.6 of the Plan, the Secured Creditor's Claim shall be Allowed in the amounts set forth in the proof of claim filed by the Secured Creditor in this Case.

### 7.   *Escrow of Cash Distributions*

On any date that Distributions are to be made under the terms of the Plan, the Disbursing Agent shall deposit in one or more segregated accounts, Cash or property equal to 100% of the Cash that would be distributed on such date on account of Disputed Claims, plus any and all interest that would accrue on the Disputed Claims during the pendency of any such dispute, as if each such Disputed Claim were an Allowed Claim but for the pendency of a dispute with respect thereto, including, but not limited to (i) Disputed Claims that may be entitled to treatment as Administrative Claims pursuant to Sections 503 and 507 of the Bankruptcy Code, (ii) claims of Governmental Units for any tax, (iii) any Disputed cure amount, and (iv) any amount due but not payable on the Closing Date on account of Administrative Claims or Claims entitled to priority pursuant to Sections 503 and 507 of the Bankruptcy Code.  The Disbursing Agent shall also segregate any interest, dividends or other proceeds of such Cash.  Such Cash together with any interest, dividends or proceeds thereof, shall be held in trust for the benefit of the holders of all such Disputed Claims pending determination of their entitlement thereto.

### 8.   *Distribution After Allowance*

148404005.6

Subject to Article III of the Plan, within five (5) days after the entry of a Final Order resolving an objection to a Disputed Claim, the Disbursing Agent shall distribute all Cash or other property, including any interest, dividends or proceeds thereof, to which a holder is then entitled with respect to any formerly Disputed Claim that has become an Allowed Claim.

9.   *Investment of Segregated Cash*

To the extent practicable, the Disbursing Agent may invest any Cash segregated on account of a Disputed Claim, disputed Interest, undeliverable distribution, or any proceeds thereof (i) in a manner that will yield a reasonable net return taking into account the safety of the investment or (ii) in any manner permitted by Section 345 of the Bankruptcy Code; ***provided***, ***however***, that the Disbursing Agent shall be under no obligation to so invest such Cash or proceeds and shall have no liability to any party for any investment made or any omission to invest such Cash or proceeds. Segregated Cash shall be maintained in an authorized depository pursuant to the guidelines of the Office of the United States Trustee.

10.   *Distribution After Disallowance*

Subject to Article 6 of the Plan, the Cash segregated on account of Disputed Claims, including the allocable portion of the net return yielded from any investment thereof, if any, remaining after all Disputed Claims have been resolved by Final Order shall revert to the Estate for distribution pursuant to the terms of this Plan.

11.   *Delivery of Distributions*

Except as provided in Article 6 of the Plan, distributions to holders of Allowed Claims and Allowed Interests shall be made (1) at the addresses set forth on the respective Proofs of Claim or proofs of Interests filed by such holders; (2) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; or (3) at the address reflected in the Schedules if no Proof of Claim or proof of Interest is filed and the Disbursing Agent has not received a written notice of a change of address.

12.   *Undeliverable Distributions*

(a)   If the Distribution to the holder of any Claim or Interest is returned to the Disbursing Agent as undeliverable, no further Distribution shall be made to such holder unless and until the Disbursing Agent is notified in writing of such holder's then current address.  Undeliverable Distributions shall remain in the possession of the Disbursing Agent until the earlier of (i) such time as a Distribution becomes deliverable or (ii) such undeliverable Distribution becomes an unclaimed distribution pursuant to Section 6.13 of the Plan.

(b)   Until such time as an undeliverable Distribution becomes an unclaimed Distribution pursuant to Section 6.13 of the Plan, within 30 days after the end of each calendar quarter following the Confirmation Date, the Disbursing Agent shall make Distributions of all Cash that has become deliverable during the preceding quarter.  Each such Distribution shall include

148404005.6

the net return yielded from the investment of any undeliverable Cash from the date such Distribution would have been due had it then been deliverable to the date that such Distribution becomes deliverable.

(c)    Nothing contained in the Plan shall require the Disbursing Agent to attempt to locate any holder of an Allowed Claim or an Allowed Interest.

13.    *Unclaimed Distributions*

Any Cash or other assets to be distributed under the Plan shall revert to the Debtors and be distributed in accordance with the terms of this Plan if it is not claimed by the entity entitled thereto before the later of (i) one year after the Effective Date; (ii) one year after such scheduled payment to such entity under Article III hereof; or (iii) one year after an Order allowing the Claim of that entity becomes a Final Order, and such entity's Claim shall be reduced to zero.

14.    *Estimation of Claims*

The Debtors or Proponent may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

15.    *Preservation of Causes of Action*

Except as otherwise provided in the Plan or in any contract, instrument, release, or agreement entered into in connection with the Plan, in accordance with Section 1123(b) of the Bankruptcy Code, all Claims or Causes of Action that the Debtors or the Estate may have against any person or entity are preserved, including without limitation, any and all Causes of Action under Sections 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code. The Proponent shall have sole power to bring (and to elect not to bring) any of the foregoing. Notwithstanding the foregoing, if Proponent or the Designee is the Purchaser, Proponent or the Designee shall have the exclusive right to direct, manage and control the pursuit of such causes of action.

## VIII.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided in the Plan or Plan Supplement, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to Sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) as of the Effective Date is subject to a pending motion to assume such Unexpired Lease or Executory Contract; (2) is a contract, engagement letter that has been approved by an order of the Bankruptcy Court, release or other agreement or document entered into in connection with the Plan, (3) is a Ground Lease, or (4) is a D&O policy or an insurance contract.

### B.    Assumption and Assignments of Executory Contracts and Unexpired Leases

In the event of a Sale, on the Sale Closing Date, all (a) Ground Leases and (b) Executory Contracts and Unexpired Leases to which any Debtor is a party, if any, as designated by Purchaser by notice to be filed with the Court not less than seven (7) days prior to the Sale Closing Date (such notice is only with respect to (b) and not with respect to (a); such notice shall be deemed to include the Ground Leases, but the assumption of the Ground Leases is without prejudice to any right of the Purchaser to enforce any default under or breach of any Ground Lease), shall be deemed assumed and assigned to the successful purchaser in accordance with Section 365 of the Bankruptcy Code, (the "Assumed Contracts"), except for those Executory Contracts and Unexpired Leases which are identified for rejection in the Sale Contract or Credit Bid Agreement, which shall be deemed rejected.

### C.    Assumption Cure Payments

In the event of a Sale, except as otherwise agreed to by the Secured Creditor and the successful purchaser, on the Sale Closing Date, the successful purchaser shall cure any and all undisputed defaults under any Assumed Contracts.  Unless the parties to an Assumed Contract agree otherwise, all disputed defaults that are required to be cured shall be cured by the later to occur of (i) ten (10) days after the entry of a Final Order determining the amount, if any, of the Debtors' liability with respect thereto and (ii) the Sale Closing Date.  Proponent shall have no liability for any cure payment with respect to any Assumed Contract.

### D.    Rejection Claims

Allowed Claims arising from the rejection of any Executory Contract or Unexpired Lease of the Debtors shall be treated as a General Unsecured Claim.

### E.    Bar to Rejection Claims

A Proof of Claim with respect to any General Unsecured Claim for damages arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall not be timely filed unless it is filed with the Bankruptcy Court and served so that it is received by the Debtors no later than thirty (30) days after the later of (i) the date of entry of a Final Order approving such rejection (unless such Final Order expressly provides a bar date with respect to such Claim, in

which event no Proof of Claim with respect to such Claim shall be deemed timely filed unless it is filed with the Bankruptcy Court and served in the manner provided in such Final Order), or (ii) the Sale Closing Date.  Any such Proof of Claim not timely filed and served shall be forever barred from assertion and may not be enforced against the Debtors' Estate, its successors or its properties.

## IX.   INJUNCTION AND EXCULPATION

### A.   Binding Effect

On the Effective Date, the terms of this Plan shall be immediately effective and enforceable and shall bind all holders of Claims against or Interests in the Debtors, whether or not such holders accept the Plan.

### B.   No Discharge.

**Except as otherwise provided in this Plan or the Disclosure Statement and 11 U.S.C. § 1141, because this is a liquidating Plan, an order confirming this Plan shall not constitute a discharge, as of the Effective Date, of any debts, claims or liabilities, whether liquidated or unliquidated, known or unknown, fixed or contingent, of the Debtors that arose at any time prior to the entry of the Confirmation Order.**

### C.   Injunction

**Except (i) as otherwise provided under a Final Order entered by the Bankruptcy Court or (ii) with respect to the Debtors' obligations under the Plan or the Class 1 Creditor Documents, the entry of the Confirmation Order shall forever stay, restrain and permanently enjoin, with respect to any Claim held against the Debtors' Estates as of the date of entry of the Confirmation Order, (i) the commencement or continuation of any action, the employment of process, or any act to collect, enforce, attach, recover or offset from the Property, or from property of the Estate that has been or is to be distributed under the Plan, and (ii) the creation, perfection or enforcement of any Lien or encumbrance against the Property and any property of the Estate that has been or is to be, distributed under the Plan.  Except as otherwise provided in the Plan, in the Class 1 Creditor Documents or in the Confirmation Order, the entry of the Confirmation Order shall constitute an injunction against the commencement or continuation of any action, the employment of process, or any act to collect, recover or offset from the Property, or from property of the Estate, any Claim, obligation or debt that was held against the Property or from property of the Estate by any person or entity as of the Confirmation Date except pursuant to the terms of the Plan.  The entry of the Confirmation Order shall permanently enjoin all creditors, their successors and assigns, from enforcing or seeking to enforce any such Claims.  For the avoidance of doubt, Section 8.2 of the Plan shall not apply to Proponent in any suit, action, or other proceeding to collect upon any Loan Document or any guaranty related to the Property.**

### D.   Exculpation

**To the extent permitted under 11 U.S.C. § 1125(e), neither Wells Fargo nor any of its members, partners, shareholders, officers, directors, employees, attorneys, advisors, agents,**

representatives and assigns (the "Released Parties") shall have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, Confirmation or consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Chapter 11 Case or the Plan and any related agreement except for bad faith, willful misconduct, gross negligence, breach of fiduciary duty, malpractice, fraud, criminal conduct, unauthorized use of confidential information that causes damages, and/or ultra vires acts. Notwithstanding any other provision of the Plan, nothing in Sections 8.2 or 8.3 of the Plan shall (a) effect a release of any Claim by the United States Government or any of its agencies or any state and local authority whatsoever, including, without limitation, any Claim arising under the Internal Revenue Bankruptcy Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in Sections 8.2 or 8.3 of the Plan enjoin the United States or any state or local authority from bringing any Claim, suit, action or other proceedings against any of the Released Parties referred to herein for any liability whatever, including, without limitation, any Claim, suit or action arising under the Internal Revenue Bankruptcy Code, the environmental laws or any criminal laws of the United States or any state and local authority, nor shall anything in this Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including liabilities arising under the Internal Revenue Bankruptcy Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Parties referred to herein, or (b) effect a release of any Claim of Proponent or any of its affiliates, including, without limitation, any Claim arising out of or under any guarantees executed in connection with the Class 1 Claim (collectively, the "Guarantees"), or any environmental law, nor shall anything in Sections 8.2 or 8.3 of the Plan enjoin Proponent from bringing any Claim, suit or action or other proceeding under or arising out of the Guarantees or any environmental law.

### E.    All Distributions Received in Full and Final Satisfaction

Except as otherwise set forth in the Plan, all Distributions to be made in accordance with the Plan on account of Claims, and all rights conferred under the Plan shall be received in full and final satisfaction of the Estate's obligations for such Claims as against the Debtor, its property and the Estate.

## X.    CONDITIONS PRECEDENT

### A.    Conditions Precedent to Confirmation of the Plan

The following conditions must be satisfied, or otherwise waived in accordance with the terms of the Plan, on or before the Confirmation Date:

        1.    The Bankruptcy Court shall have approved the Disclosure Statement in form and substance acceptable to the Proponent; and

2.      The entry of the Confirmation Order shall be in form and substance reasonably satisfactory to Proponent, and shall contain provisions that, among other things: (i) authorize the implementation of the Plan in accordance with its terms; (ii) approve in all respects the other settlements, transactions, and agreements to be effected pursuant to the Plan; (iii) find that the Plan complies with all applicable provisions of the Bankruptcy Code, including that the Plan was proposed in good faith and that the Confirmation Order was not procured by fraud; and (iv) establish the Administrative Claim Bar Date.

### B.      Conditions Precedent to the Plan Effective Date

The Effective Date shall not occur and no obligations under the Plan shall come into existences unless each of the following conditions is met or, alternatively, is waived by Proponent in accordance with the terms of the Plan, on or before the Effective Date:

1.      The Bankruptcy Court shall have entered the Confirmation Order, which shall grant final approval of the Plan;

2.      The Confirmation Order shall be in full force and effect and not subject to any stay, modification or injunction;

3.      Except to the extent not required under the Confirmation Order or other order of the Bankruptcy Court, all governmental and material third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained or entered, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that could restrain, prevent or otherwise impose materially adverse conditions on such transactions;

4.      All documents and agreements necessary to implement the Plan, will have (a) been tendered for delivery and (b) been effected or executed by all entities party thereto, or will be deemed executed and delivered by virtue of the effectiveness of the Plan as expressly set forth herein, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements; and

5.      All conditions to the effectiveness of any Sale Contract or Credit Bid Agreement, as applicable, shall have been satisfied.

### XI.      RETENTION OF JURISDICTION

### A.      Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, until the Chapter 11 Case is closed, the Bankruptcy Court shall retain and have original, but not exclusive, jurisdiction to:

1.      Ensure that the Plan is consummated, and to enter any Order pursuant to Section 1142(b) of the Bankruptcy Code, to compel the Debtor, the Interest holders and any other necessary party, to take such action and execute such documents to effectuate the Plan;

2.      Consider any modification of the Plan proposed pursuant to Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019;

3.      Allow, disallow, determine, liquidate, classify or establish the priority, secured or unsecured status of any Claim or Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense, the resolution of any and all objections to the allowance or priority of Claims or Interests, and the resolution of any adversary proceeding;

4.      Grant or deny any and all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for any period ending on or before the Effective Date;

5.      Resolve any motions pending on the Effective Date to assume, assume and assign or reject any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor may be liable and to hear, determine and if necessary, liquidate, any and all Claims arising therefrom;

6.      Ensure that Distributions to holders of Allowed Claims and Allowed Interests are accomplished in accordance with the provisions of this Plan;

7.      Decide or otherwise resolve any and all applications, motions, adversary proceedings, contested or litigated matters, and any other matters or grant or deny any applications involving the Debtor that may be pending on the Effective Date;

8.      Enter such Orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan or Disclosure Statement or to enforce all orders, judgments, injunctions, and rulings entered in connection with the Chapter 11 Case;

9.      Resolve any and all controversies, suits or issues that may arise in connection with the consummation, interpretation or enforcement of the Plan;

10.     Modify the Plan before or after the Effective Date pursuant to Section 1127 of the Bankruptcy Code, or to modify the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with the Plan or Disclosure Statement;

11.     Remedy any defect or omission or reconcile any inconsistency in any Order, the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with the Plan, to the extent authorized herein or in the Bankruptcy Code;

148404005.6

12.    Issue any injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan, including the Confirmation Order or any other order of the Bankruptcy Court;

13.    Enter and implement such Orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

14.    Determine any dispute arising under or related to the Plan, including, without limitation, any dispute concerning the scope or effect of any release or discharge provided for by the Plan or the Confirmation Order;

15.    Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or Disclosure Statement;

16.    To adjudicate any disputes related to the Confirmation Order, the Sale or alternatively, any auction and sale process as well as disputes relating to the Bid Procedures; and

17.    Enter a Final Order or decree concluding the Chapter 11 Case.

**B.    Post-Effective Date Jurisdiction**

Notwithstanding the entry of a final decree or an order closing the Chapter 11 Case, the Bankruptcy Court shall retain jurisdiction to reopen the Chapter 11 Case for the purpose of enforcing, by injunction or otherwise, the terms of the Plan, the Confirmation Order and any final decree, including, without limitation, the enforcement of any rights of the Debtor.

**XII.    CERTAIN TAX CONSEQUENCES OF THE PLAN**

**A.    General**

**THE DESCRIPTION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN PROVIDED BELOW IS LIMITED TO THE SPECIFIC FEDERAL INCOME TAX MATTERS DESCRIBED HEREIN.    IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN OR OTHER FEDERAL INCOME TAX MATTERS DISCUSSED HEREIN AND THIS DISCUSSION DOES NOT CONSIDER OR PROVIDE ANY CONCLUSIONS WITH RESPECT TO ANY SUCH ADDITIONAL ISSUES.    EACH TAXPAYER IS STRONGLY URGED TO SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM SUCH TAXPAYER'S INDEPENDENT TAX ADVISOR.**

**THE DESCRIPTION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN PROVIDED BELOW IS SOLELY FOR THE PURPOSE OF COMPLIANCE WITH SECTION 1125(a) OF THE BANKRUPTCY CODE.    THE**

DESCRIPTION IS BASED ON THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "INTERNAL REVENUE CODE") TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT.  CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION MAY HAVE RETROACTIVE EFFECT, WHICH MAY CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.  NO RULING HAS BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE (THE "IRS") AND NO LEGAL OPINION HAS BEEN REQUESTED FROM COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN, AND NO TAX OPINION OR ADVICE IS GIVEN BY THIS DISCLOSURE STATEMENT.  TO THE EXTENT ANYTHING DESCRIBED HEREIN CONFLICTS WITH ANY OFFICIAL PUBLICATION OF THE IRS, THE IRS PUBLICATION SHALL CONTROL.

This description does not cover all aspects of federal income taxation that may be relevant to the Debtor or holders of Claims.  For example, the description does not address issues of special concern to certain types of taxpayers, such as dealers in securities, life insurance companies, financial institutions, tax exempt organizations and foreign taxpayers, nor is it intended to address all of the possible federal income tax consequences to holders of Claims against the Debtor.  This description also does not discuss the possible state tax or non-U.S. tax consequences that might apply to the Debtor or to holders of Claims.

**B.      Tax Consequences of Payment of Allowed Claims Pursuant to Plan Generally**

The federal income tax consequences of the implementation of the Plan to the holders of Allowed Claims will depend, among other things, on the consideration to be received by the holder, whether the holder reports income on the accrual or cash method, whether the holder's Claim is Allowed or Disputed on the Effective Date, and whether the holder has taken a bad debt deduction or a worthless security deduction with respect to its Claim.  All holders of Claims are urged to consult with their tax advisors concerning the tax consequences applicable under the Plan.  Nothing contained herein shall be relied upon as tax advice.

1.      *Recognition of Gain or Loss*

In general, a holder of an Allowed Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the holder's tax basis in the Claim.  Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Allowed Claim and the holder, the length of time the holder held the Claim and whether the Claim was acquired at a market discount or premium. If the holder realizes a capital loss, the holder's deduction of the loss may be subject to limitation. The holder's tax basis for any property received under the Plan generally will equal the amount realized.

2.    *Bad Debt or Worthless Security Deduction*

A holder who receives in respect of an Allowed Claim an amount less than the holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166 of the Internal Revenue Code. The rules governing the availability, character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claims, holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

3.    *Receipt of Interest*

The Plan does not address the allocation of the aggregate consideration to be distributed to holders between principal and interest and the Debtor cannot make any representations as to how the IRS will address the allocation of consideration under the Plan. In general, to the extent that any amount of consideration received by a holder is treated as received in satisfaction of unpaid interest that accrued during such holder's holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income and not otherwise exempt from U.S. federal income tax). Conversely, a holder may be allowed a bad debt deduction to the extent any accrued interest was previously included in its gross income but subsequently not paid in full. However, the IRS may take the position that any such loss much be characterized based on the character of the underlying obligation, such that the loss will be a capital loss if the underlying obligation is capital asset. Again, holders of Allowed Claims should address all potential tax implications with their own tax advisors.

## XIII.    <u>MISCELLANEOUS PLAN PROVISIONS</u>

### A.    <u>Orders in Aid of Consummation</u>

Pursuant to Sections 105, 1141, 1142 and 1143 of the Bankruptcy Code, the Bankruptcy Court may enter one or more Orders in aid of Confirmation directing the implementation of matters or actions required by the Plan.

### B.    <u>Compliance with Tax Requirements</u>

In connection with the Plan, the Debtors shall comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities and Distributions under the Plan shall be subject to such withholding and reporting requirements; ***provided, however***, that the transfer of any Cash, the Property or other assets or interests hereunder shall not be subject to any federal, state or local tax to the fullest extent provided under Section 1146 of the Bankruptcy Code.

### C.    <u>Due Authorization by Claim Holders</u>

Each and every holder of a classified and/or unclassified Claim who accepts the Distributions provided for under the Plan warrants that it is the lawful owner of such Claim and is authorized to accept the Distributions provided for in the Plan and that there are no outstanding Liens, encumbrances, commitments, agreements, or understandings, express or implied, that may

or can in any way defeat or modify the rights released, conveyed or modified by the Plan, or obligations undertaken by such Claim holder under the Plan.

### D.    Amendments

The Proponent reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend, modify, or supplement the Plan (i) prior to the entry of the Confirmation Order, and (ii) after entry of the Confirmation Order, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case, without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to this Plan, prior to the Effective Date, the Proponent may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of this Plan, and any holder of a Claim that has accepted the Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

### E.    Reservation of Rights

Neither the filing of this Plan, nor any statement or provision contained herein, shall be or be deemed to be an admission against interest.  In the event that the Effective Date does not occur, neither this Plan nor any statement contained herein may be used or relied upon in any manner in any suit, action, proceeding or controversy within or outside of this Case.

### F.    Revocation or Withdrawal of Plan

The Proponent reserves the right to revoke or withdraw the Plan at any time prior to the Effective Date.  If the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, the Debtors; (ii) prejudice in any manner the rights of any party in interest in this chapter 11 proceeding; or (iii) constitute an admission of any sort by any party in interest in this chapter 11 proceeding.

### G.    Request for Relief Under Section 1129(b)

If the Plan is accepted by one or more, but not all, impaired Classes of Claims, the Proponent may request confirmation under Section 1129(b) of the Bankruptcy Code of any Class of Claims, subject to any modification of the Plan made pursuant to Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

### H.    Additional Documents

Except as otherwise provided in the Plan, on or before the Effective Date, the Proponent may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, including, but

not limited to, the Plan Supplement. The Proponent and all holders of Claims receiving Distributions pursuant to the Plan, and all other parties in interest, shall, prepare, execute, and deliver an agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

## I.      Section Headings

The section headings contained in the Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

## J.      Computation of Time

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## K.      Successors and Assigns

The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

## L.      Notices

All notices, requests, demands and other communications to be given or made hereunder, to be effective, shall be in writing (including by electronic or facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

      1.      if to the Debtors, at Shuker & Dorris, P.A., 121 S. Orange Avenue, Suite 1120, Orlando, Florida 32801, Attention: R. Scott Shuker, Esq., email rshuker@shukerdorris.com;

      2.      if to Proponent, at Perkins Coie LLP, 1155 Avenue of the Americas, New York, New York 10036-2711, Attention Gary Eisenberg, Esq., email: geisenberg@perkinscoie.com and GrayRobinson, P.A., 301 E. Pine Street, Suite 1400, email: Roy.Kobert@gray-robinson.com

      3.      if to any Claim holder, at (i) the addresses set forth on the Proofs of Claim filed by such holders; (ii) the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; or (iii) the address reflected in the Schedules if no Proof of Claim is filed and the Disbursing Agent has not received a written notice of a change of address; and

      4.      if to any entity that has filed a notice of appearance, at the addresses set forth on such notice of appearance.

### M.    <u>Governing Law</u>

Except to the extent that the Bankruptcy Code or Bankruptcy Rules or other Federal law are applicable, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

### N.    <u>Severability</u>

In the event any provision of the Plan is determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any or all other provisions of the Plan.

### O.    <u>Business Day</u>

In the event that the Plan requires an act to be performed on a day that is not a Business Day, such act shall be performed on the first Business Day thereafter.

## XIV.   <u>CONFIRMATION OF PLAN – REQUIREMENTS</u>

In order for the Plan to be confirmed, the Bankruptcy Code requires, among other things, that the Plan be proposed in good faith, that the Debtor disclose specified information concerning payments made or promised to insiders, and that the Plan comply with the applicable provisions of chapter 11 of the Bankruptcy Code.  Section 1129(a) of the Bankruptcy Code also requires that at least one Class of Claims has accepted the Plan ("<u>Minimum Voting Threshold</u>"), that Confirmation of the Plan is not likely to be followed by the need for further financial reorganization, and that the Plan be fair and equitable with respect to each Class of Claims that is impaired under the Plan.  The Bankruptcy Court can confirm the Plan if it finds that all of the requirements of section 1129(a) have been met.  The Debtor believes that the Plan meets all of these required elements.  With respect to the so-called "feasibility" test (i.e., that the Plan is not likely to be followed by the need for further financial reorganization), the Plan maximizes the value of the Estate and the Debtor believes that it will be able to consummate the Plan fully.

In the event that a Class of Claims votes to reject the Plan, the Plan does not satisfy all of the requirements of Section 1129(a) of the Bankruptcy Code.  Although the Minimum Voting Threshold is not met, the Bankruptcy Court nevertheless may confirm the Plan under the "cram down" provisions of Section 1129(b) of the Bankruptcy Code if all of the other provisions of Section 1129(a) of the Bankruptcy Code are met.  Thus, the Proponent presently intends, to the extent necessary, (i) to undertake to have the Bankruptcy Court confirm the Plan under the "cram down" provisions of Section 1129(b) of the Bankruptcy Code, and (ii) to amend the Plan to the extent necessary to obtain entry of the Confirmation Order.

In order to confirm a plan over the dissenting vote of an impaired Class under Section 1129(b) of the Bankruptcy Code that satisfies the remaining provisions of Section 1129(a) of the Bankruptcy Code, the Bankruptcy Court, on request of the proponent of a plan, "shall" confirm the Plan if the Plan does not discriminate unfairly, and is fair and equitable with respect to each Class of Claims that is impaired under, and has not accepted, the Plan.  For purposes of Section 1129(b) of the Bankruptcy Code, a Plan is "fair and equitable" with respect to a class of unsecured

148404005.6

creditors if, at a minimum, it satisfies the "absolute priority rule" and the "best interests of creditors test."

### A.    Absolute Priority Rule

To satisfy the absolute priority rule, the Plan must provide that the holder of any Claim that is junior to the Claims of the dissenting Class will not receive or retain under the Plan on account of such junior Claim any property unless the Claims of the dissenting Class are paid in full.

The Proponent believes that the Plan satisfies the absolute priority rule, since no Class as to any Debtor will receive any distribution prior to any Class of that Debtor having priority over said class receiving payment in full of its Claims.  The Proponent further believes that all non-accepting impaired Classes of each Debtor will receive or retain payment or Distribution, as the case may be, on account of their Claims, sufficient to permit full satisfaction of such Claims before junior Classes of the corresponding Debtor receive or retain any property on account of such junior Claims.

### B.    Feasibility

The Bankruptcy Code requires that to confirm a chapter 11 plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor(s) unless contemplated by the plan. The Plan provides for the sale of the Debtors' businesses. Accordingly, the Proponent believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

### C.    Best Interest of Creditors Test; Liquidation Analysis

Notwithstanding acceptance of the Plan by a voting Class of creditors, in order to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each holder of a Claim or Interest in any such Voting class which has not voted to accept the Plan, meaning that the Plan provides each such holder with a recovery that has a value at least equal to the value of the recovery that each such holder would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code beginning on what would have been the Effective Date.  Accordingly, if a voting class does not vote unanimously to accept the Plan, the best interests test under section 1129(a)(7) of the Bankruptcy Code requires the Bankruptcy Court to find that the Plan provides to each member of such voting Class a recover on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the recovery that each such Class member would receive if the Debtor was liquidated under chapter 7.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of the properties securing their liens.  If any assets are remaining in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to receive payment. Unsecured creditors are paid from any remaining sales proceeds, according to their respective priorities.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors

with the same priority. Finally, equity interest holders receive the balance that remains, if any, after all creditors are paid.

Here, all or substantially all of the assets of the Debtors' business will be liquidated through the Sale Transaction and the Plan effects a liquidation of the Debtors' remaining assets. Although a chapter 7 liquidation would achieve the same goal, Proponent believes that the Plan provides a greater recovery to holders of Secured Claims and Allowed General Unsecured Claims than would a chapter 7 liquidation. Liquidating the Debtors' Estate under the Plan likely provides holders of Allowed Secured Claims and Allowed General Unsecured Claims with a larger, more timely recovery primarily due to expected materially lower realized sale proceeds in chapter 7 together with Proponent's contribution of a portion of sale proceeds to effectuate a distribution to holders of Allowed General Unsecured Claims, who otherwise would receive no distribution if the Debtors' assets were sold in Chapter 7 and the net proceeds less than the Allowed Amount of Proponent's Claim.

Here, the Proponent believes that the Plan satisfies the best interests test, because, among other things, the recoveries expected to be available to holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available through a chapter 7 liquidation. The primary advantages of the Plan over a chapter 7 liquidation are as follows:

>           (i)   *A Refinancing Will Provide Greater Recoveries Than a Chapter 7
>                 Liquidation*

Pursuing the Plan within chapter 11 allows the Debtors the possibility to refinance the Secured Creditor's claim in full, whereas under chapter 7, however, a trustee can only consider the sale option. For the following reasons, a Refinancing will provide greater recoveries than a chapter 7 liquidation:

>           (a)   The Sale. In a chapter 7 liquidation, the full amount of Wells
>           Fargo's claim – approximately $75,206,784.95 million – would have to get paid
>           first, before any other claim could receive any distribution. In the Land Debtors'
>           First Disclosure Statement and Plan, the Debtors advised that a sale of the
>           Property in its current near-vacant state had substantially reduced value. While
>           the Proponent continues to evaluate the collateral, if there has been a substantial
>           reduction in value, the only creditor who would receive any recovery would be
>           Wells Fargo; Radisson and all other unsecured creditors *would receive no
>           recovery*. By contrast, the sale contemplated hereunder offers each unsecured
>           creditor the opportunity to become part of Class 4 and receive some Distribution
>           as provided therein.

>           (b)   Refinancing. Under a Refinancing, (1) Wells Fargo's
>           Allowed Claim will be paid in full, (2) Radisson's Allowed Claim will be paid
>           in full or otherwise satisfied to Radisson's agreement, and (3) the Debtors'
>           assets, including the Property, would vest in the Debtor, allowing for a
>           possibility that the Allowed Claims of all unsecured creditors would be paid in
>           full or part, a better result than in a sale as contemplated above.

40

Thus, because of Distributions to be made under the Plan and because the Debtor's ability to pursue a Refinancing would be lost in the event of a conversion to chapter 7, creditors stand to receive greater recoveries under the Plan than through a chapter 7 liquidation.

(ii) *A Sale Pursuant to the Plan Will Provide Greater Recoveries Than a Chapter 7 Liquidation*

Pursuing the sale of the Property as proposed in the Plan will provide far greater recoveries than pursuing the sale of the Property through a chapter 7 liquidation for the following reasons:

Liquidating the Debtors' estate under chapter 7 would likely provide a smaller distribution to creditors because of the fees and expenses which would be incurred during a chapter 7 liquidation. In addition to the expected material reduction in sale proceeds, recoveries would be further reduced (in comparison with the Plan) due to the expenses that would be incurred in a chapter 7 liquidation, including added expenses for wind down costs and costs incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtors' assets, and these specific chapter 11 cases, in order to complete the administration of the Estate. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee up to three percent of the value of the assets); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals). In addition, chapter 7 trustee sales are often perceived by the market as fire sales and thus often generate lower proceeds than sales in chapter 11 proceedings. Were that to happen here, the proceeds of a chapter 7 sale would be less than those contemplated under the Sale.

As a result, if the assets of the Debtors exceed in value the amount of Proponent's Allowed Claim, the sale in chapter 11 will likely be less expensive and yield greater proceeds, producing greater recoveries for creditors and parties in interest. If the assets of the Debtors do not exceed in value the amount of Proponent's Allowed Claim, the Plan will provide for a distribution for unsecured creditors that they would not receive in a chapter 7 case. Thus, whether the assets of the Debtors are worth more or less than Proponent's Allowed Claim amount, the Plan will likely yield greater proceeds, producing greater recoveries for creditors and parties in interest. Thus, in light of the foregoing, the Proponent believes the Plan satisfies the "best interests of creditors test," and, indeed, that the Plan is in the best interest of creditors.

## XV.    PLAN RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.    Certain Bankruptcy-Related Considerations

#### 1.    *Parties in Interest May Object to the Classification of Claims*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim in a particular class only if such claim is substantially similar to the other claims in such class. The Proponent believes that the classification of Claims under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.    *Risk of Plan Not Being Confirmed*

41

Although the Proponent believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can also be no assurance that modifications of the Plan will not be required for Confirmation, that any negotiations regarding such modifications would not adversely affect the holders of the Allowed Claims or that any such modifications would not necessitate the re-solicitation of votes.

### 3. *Nonconsensual Confirmation*

As set forth above, in the event any impaired class of claims does not accept a plan, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the acceptance of any "insider" in such class) and, as to each impaired class which has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to non-accepting impaired classes.

In the event that any Impaired Class of Claims fails to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code, the Proponent reserves the right to seek nonconsensual confirmation of the Plan in accordance with section 1129(b) of the Bankruptcy Code.

### 4. *Risks that Conditions to Effectiveness Will Not Be Satisfied*

Article XI of the Plan contains certain conditions precedent to the effectiveness of the Plan. There can be no assurances that the conditions contained in Article XI will be satisfied.

### 5. *Claims Objections/Reconciliation Process*

The Proponent reserves the right to object to the amount of any Claim, except as provided in the Plan. The estimates set forth herein cannot be relied on by any holder of a Claim whose Claim is subject to an objection. Any such holder of a Claim may not receive its specified share of the estimated distributions described in the Disclosure Statement.

### B. **Alternatives to the Plan and Consequences of Rejection**

Among the possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan are the following: (i) an alternative plan could be proposed or confirmed; or (ii) the Chapter 11 Case could be converted to a liquidation case under chapter 7 of the Bankruptcy Code.

### 1. *Alternative Plan*

a.       With respect to an alternative plan, the Debtors have explored various alternative scenarios, but they withdrew the previous plan they filed, and Proponent believes that that plan could not have been confirmed in any event. Indeed, Proponent believes that no plan can be confirmed for the Debtors without Proponent's consent, and the Debtors have not made material efforts to obtain Proponent's consent to any plan. In any event, the Proponent believes that the Plan enables the holders of Claims to realize the

maximum recovery under the circumstances. The Proponent believes that the Plan is the best plan that can be proposed and serves the best interests of the parties-in-interest.

       **b.**      As noted above, the Land Debtors' First Disclosure Statement and Plan were withdrawn. It is unclear whether the Debtors can successfully propose any plan that provides treatment other than the Plan and can (i) obtain the acceptance of the Secured Creditor and (ii) be confirmed. Thus, the Proponent believes that its Plan will maximize value for all creditors.

### 2. *Chapter 7 Liquidation*

As discussed above in Section XII(B), the Proponent believes that the Plan satisfies the best interests test, because, among other things, the recoveries expected to be available to holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available through a chapter 7 liquidation.

## XVI. PROCEDURES FOR VOTING ON PLAN

As noted above, pursuant to the Bankruptcy Code, a plan groups various claims into classes, each consisting of parties having similar legal rights in relation to a debtor. Each class may then be treated as either "impaired" or "unimpaired" under a plan. There are three ways in which a plan may leave a claim or interest "unimpaired." First, a plan may not propose to alter the legal, equitable or contractual rights of the holder of the claim or interest. Second, all defaults (excluding those covered by Section 365(b)(2) of the Bankruptcy Code) may be cured and the original terms of the obligation reinstated. Third, a plan may provide for the payment in full of the obligation to the holder of the claim or interest. If a class is unimpaired, then it is conclusively presumed to vote in favor of a plan.

An Impaired Class that would receive nothing under a plan is deemed to have rejected such a plan.

An Impaired Class that is proposed to receive any Distribution has the right to vote, as a class, to accept or reject the plan. A Class of creditors accepts a plan if more than one-half (1/2) of the ballots that are timely received from members of such Class, representing at least two-thirds (2/3) of the dollar amount of Claims for which ballots are timely received, vote in favor of such plan. Section 1126(e) of the Bankruptcy Code provides that a creditor's vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that the creditor's vote either to accept or reject a plan was not solicited or case in good faith, or in compliance with the Bankruptcy Code. A plan under which any Class of Claims is Impaired may be confirmed by the Bankruptcy Court only if it has been accepted by at least one such Class.

Each holder of an Allowed Claim in an Impaired Class which retains or receives property under the Plan shall be entitled to vote separately to accept or reject the Plan and shall indicate such vote on a duly executed and delivered Ballot as provided in such order as is entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

Holders of Claims in an Impaired Class entitled to vote will receive, together with this Disclosure Statement, a Ballot to be used in voting to accept or reject the Plan.  Voting instructions will accompany the Ballot.

Each creditor should first carefully review this Disclosure Statement and the Plan.  The Creditor should then complete the portions of the Ballot indicating the Class or Classes in which the creditor's Claim falls and the total dollar amount of the Claim.  If the creditor's Claim falls into more than one Class, then the creditor should list each Class and state the dollar amount of the Claims which belongs in each Class.  It is critical that the Class(es) and amounts of the Claim be correct stated on the Ballot, so that the creditor's vote can be properly counted.

Next, the creditor should mark in the space provided on the Ballot whether the creditor wishes to accept or to reject the Plan.  Please be sure to fill in the name of the creditor for whom the Ballot is being filed.  Finally, the Ballot must be signed by the creditor, or by an officer, partner, or other authorized agent of the creditor.  Please note that the Debtor reserves the right to object to the allowance, designation of Class and/or allowable amount of any Claim set forth in a Ballot for purposes of voting and/or Distribution under the Plan.

Completed and signed Ballots should be returned by first class mail to the Court at the below address in the enclosed self-addressed return envelope:

**United States Bankruptcy Court, Middle District of Florida**

**George C. Young United States Federal Building and Courthouse**

**400 West Washington Street**

**Suite 5100**

**Orlando, FL 32801**

Ballots may also be submitted by the Court's eballot hyperlink:

https://pacer.flmb.uscourts.gov/cmecf/ballots/submission.asp

Completed Ballots should be returned as soon as possible, and, in any event so that they are RECEIVED NO LATER THAN OCTOBER 5, 2020 AT 4:00 P.M.  ANY BALLOTS WHICH ARE RECEIVED BY THE PROPONENT AFTER OCTOBER 5, 2020 AT 4:00 P.M. SHALL NOT BE COUNTED IN DETERMINING ACCEPTANCE OR REJECTION OF THE PLAN.

## XVII.  CONFIRMATION HEARING

The Confirmation Hearing will be held by the Honorable Karen S. Jennemann, United States Bankruptcy Judge, on **October 14, 2020 at 1:00 p.m.**, in the United States Bankruptcy

148404005.6

Court, Middle District of Florida, George C. Young Courthouse, 400 W. Washington Street, Courtroom 6A, 6th Floor Orlando, Florida 32801. At that hearing, the Bankruptcy Court will decide whether the Plan should be confirmed and will hear and decide any and all objections to the Plan. Any creditor, or other party in interest who wishes to object to Confirmation of the Plan, or to the classification of Claims provided in the Plan, must, not later than **4:00 p.m. on October 7, 2020**, file an objection with the Clerk of the United States Bankruptcy Court Middle District of Florida, George C. Young Courthouse, 400 W. Washington Street, Orlando, Florida 32801, and serve a copy of the objection on the following persons: (i) The Office of the United States Trustee for the Southern District of New York, George C. Young Courthouse, 400 W. Washington Street, Suite 1100, Florida 32801, Attention: Jill Kelso; (ii) counsel to the Debtor: Shuker & Dorris, P.A., 121 South Orange Avenue, Orlando, FL 32801 ; (iii) counsel to Wells Fargo: Perkins Coie LLP, 1155 Avenue of the Americas, New York, NY 10036, Attention: Gary F. Eisenberg, Esq.

Any objections to the Plan which are not filed and served by the above date may not be considered by the Bankruptcy Court. Any person or entity who files an objection to Confirmation of the Plan or to the classification of Claims provided in the Plan must also attend the Confirmation Hearing, either in person or through counsel.

If the Plan if confirmed, its provisions will bind the Estate and any and all Persons, including all holders of Claims, whether or not the Claim of such holder is impaired under the Plan and whether or not the holder has, either individually or by a Class, voted to accept the Plan.

**[remainder of page deliberately left blank]**

## XVIII.   RECOMMENDATION

The Proponent believes that the Plan provides for the fair and equitable treatment of the Debtor's creditors and therefore recommends that creditors vote to accept the Plan.

WELLS FARGO, N.A., AS TRUSTEE FOR THE BENEFIT OF THE HOLDERS OF UBS COMMERCIAL MORTGAGE 2017-C3, UBS COMMERCIAL MORTGAGE 2017-C2 AND CREDIT SUISSE CASIL 2017-CX9 MORTGAGE TRUST COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES

BY:  Midland Loan Services, a division of PNC Bank, National Assocation

David Spotts Digitally signed by David Spotts
Date: 2020.08.27 14:26:31 -05'00'

By:   _____
Name:
Title:


*/s/ Roy S. Kobert*_____
GrayRobinson, P.A.
Roy S. Kobert, Esquire
Florida Bar No. 777153
301 E. Pine Street, Suite 1400
Orlando, FL 32801
(407) 843-8880 Telephone
(407) 244-5690 Facsimile
*Local Counsel for Proponent*

- and -

Perkins Coie, LLP
Gary F. Eisenberg, Esquire
New York Bar No.: 2332823
1155 Avenue of the Americas
22nd Floor
New York, NY 10036-2711
(212) 262-2902 Telephone
(212) 977-1632 Facsimile
geisenberg@perkinscoie.com

148404005.5

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true copy of the foregoing was served via the Court's CM/ECF notification to those parties who are registered CM/ECF participants in this case this 28th day of August, 2020.

/s/ Roy S. Kobert
Roy S. Kobert, Esq.
Florida Bar No. 777153